**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BRAD LYNN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. 07-0173-KD-C** |
| **ROMAR MARINA CLUB, L.L.C.,** ) | |
| **MICHAEL SPECCHIO, H. RAY HIX, JR.,** ) | |
| **and HSK PROPERTIES, L.L.C.** ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

This matter is before the Court on the following: Plaintiff's motion for summary judgment

on the breach of contract claim against Defendant Ray Hix (Claim One) and motion for summary

judgment on Plaintiff's breach of express third-party beneficiary contract claim against Defendant

Michael Specchio (Claim Two) (Doc. 135) and the various responses/cross-motions and replies

thereto (Docs. 142, 143, 146-148, 150, 151, 154, 156);[1] Defendant Hix' motion to adopt Defendants

Specchio and Romar Marina Club's Affidavit of Thomas M. Marr, Sr. (Doc. 152); and Plaintiff's

motion to strike evidentiary material in Docs. 151 and 152 (Doc. 153) and Defendant Hix' Reply

thereto (Doc. 155).[2]

---

     [1] Including Defendant Specchio's response in opposition and brief in support of cross motion for
summary judgment (Doc. 142); Defendant Specchio's cross motion for summary judgment on Claim Two
(Doc. 143); Defendant Hix's supplemental response in opposition to summary judgment and brief in
support of cross motion for summary judgment (Doc. 146); Defendant Hix's cross motion for partial
summary judgment as to claim one(Docs. 147, 148); Plaintiff's reply brief to Defendants' opposition
briefs (Doc. 150); Defendant Specchio's supplement to opposition to Plaintiff's motion for partial
summary judgment (Doc. 151); Plaintiff's reply to response to Defendants' opposition briefs and
response to cross motions for partial summary judgment. (Doc. 154); and Defendant Specchio's Reply to
Plaintiff's reply to his response to the motion for partial summary judgment (Doc. 156).

     [2] The summary judgment briefs filed in this case exceeded the allowable page limitation.
Counsel are reminded to, in the future, ensure compliance with Local Rule 7.1(b) which provides that

For the reasons set forth herein, Plaintiff's motion for partial summary judgment as to Count One against Defendant Hix is **DENIED** and Hix's motion for summary judgment as to Count One is **GRANTED**.  Plaintiff's motion for partial summary judgment as to Count Two against Defendant Specchio is **DENIED** and Specchio's motion for summary judgment as to Count Two is **GRANTED**.

## I.   <u>Background</u>

This action arises from a dispute surrounding a series of contracts for the purchase of a marina in Orange Beach, Alabama.  Specifically, on March 3, 2006, Plaintiff Brad Lynn ("Plaintiff") presented a signed a purchase agreement Offer ("the Offer") to Thomas Marr of Romar Marina, Inc., one-half owner of the Romar Harbor Marina in Orange Beach, Alabama ("the marina"), to purchase the marina for $4 million.[3]  (Doc. 93 at 7).  There is nothing in the record indicating that Marina Romar, Inc. accepted this initial Offer within the time frame allowed; thus, this Offer appears to

---

summary judgment briefs shall not exceed 30 pages in length; otherwise, the motions will be subject to being stricken.   Additionally, no longer pending before the Court is Doc. 144, Defendant Hix's partial response in opposition to Plaintiff's motion for summary judgment (Doc. 144), per Doc. 146 at 1 ("[]this document is intended to replace Hix' partial response filed on January 26, 2009. (*See* Doc. 144)."

[3] The Offer specifies the terms as a new conventional mortgage, as follows: "[t]he full purchase price upon execution and delivery of Warranty Deed/Bill of Sale, contingent upon Purchaser's ability to obtain a 30 year condo (type) mortgage . . . ."  (Doc. 135-16 at 5).  The Offer provides further that Plaintiff's offer is subject to property appraising for at least the purchase price.  (<u>Id.</u>)  The Offer states as well, that the sale shall be closed and deed/bill of sale delivered on July 3, 2006 or sooner if mutually agreed upon in writing by the Purchaser and Seller; time shall be of the essence; title is to be taken in the names of Plaintiff and his successors or assigns; a period of thirty (30) days from the date of closing shall be allowed for closing if the closing is delayed by reason of title defects that can be readily corrected; and a period of ten (10) days from the date of closing shall be allowed for closing if the terms of purchase require a new mortgage and the lender issues a written unconditional commitment letter no later than the date of closing but is delayed in consummating the mortgage.  (Doc. 135-16 at 7).

2

have expired by operation of its own terms.[4]

On April 3, 2006, Gulf Coast Title Company issued a Commitment for Commonwealth Land Title Insurance Company for Plaintiff for $4 million for Parcels A and B of the marina, which was countersigned on April 14, 2006.  (Doc. 74-3 at 22-26).  On April 12, 2006, Plaintiff executed a contract with Marina Romar, Inc. (with Thomas M. Marr, Sr., its President)[5], to purchase the marina for $4 million (the "Purchase Agreement").  (Doc. 93-2 at 9; Doc. 135-16).  As part of the Purchase Agreement, the parties agreed in pertinent part as follows: That Plaintiff would pay $25,000 in earnest money; the closing shall be on or no later than May 22, 2006; the Plaintiff has thirty-one (31) days from April 12, 2006, to do due diligence; in the event that Plaintiff assigns the Agreement, he shall give written notice to the seller no less than three days before closing; and that in the event that either Plaintiff or seller do not terminate the agreement on or before May 8, 2006 but fail to consummate the Agreement, each would have the right to pursue any remedy available at law or in equity as a result of such breach.  (Id.)  The Agreement provided further for Plaintiff to deposit the $25,000 with third-parties Marr and Friedlander Attorneys as earnest money in consideration for the contract.  (Doc. 135-16).  The Agreement stated that "**[t]ime is of the essence with reference to all provisions contained herein**."  (Id. (emphasis added))  The Agreement does not provide any provision or terms indicating that the purchase of the marina is contingent on obtaining financing.

---

[4]  The subsequently executed Purchase Agreement provides a merger clause stating that "[t]his Agreement states the entire Agreement between the parties hereto, and any prior Agreements or merged into this written Agreement, and no modification of this Agreement shall be binding unless attached hereto and signed by both PURCHASER and SELLER."  (Doc. 135-16 at 3).  As such, even if Plaintiff's Offer was attached to the Agreement, it is signed only by Plaintiff and thus, according to the Purchase Agreement's terms, it is not binding.

[5]  Thomas M. Marr, Sr. executed the agreement on behalf of Marina Romar, Inc., as its president.

Plaintiff discussed the marina Purchase Agreement with Defendant H. Ray Hix, Jr.[6] ("Defendant Hix") and Hix's law partner Haymes Snedeker ("Snedeker"). Defendant Hix and Snedeker were interested in participating in the marina Purchase Agreement with Plaintiff such that an assignment of rights to the Purchase Agreement would need to be executed. As a result, they came to an agreement whereby on April 12, 2006, Plaintiff paid one-half or $12,500 of the $25,000 due in earnest money to Defendant Hix and then on April 13, 2006, Snedeker wrote a $25,000 check to the marina seller's trust account.[7] (Doc. 74-3 at 35; Doc. 135-4 (Dep. Hix at 140, 146); Doc. 146-4 at 47 (Dep. Plf at 184, 188)). Thereafter, on April 21, 2006, Plaintiff executed a contract (drafted by Defendant Hix) entitled "Assignment of Contract Rights and Obligations" with Defendant Hix and Snedeker relating to the Purchase Agreement. This contract provided that Plaintiff would "transfer[] all rights and obligations" as described therein (concerning the property rights to the marina) to Defendant Hix, Snedeker and Lynn (as Assignees collectively). (Doc. 135-4 (Dep. Hix at 148, 150); Doc. 74-3 at 44; Doc.135-5; Doc. 142-2; Doc. 146-4 at 51 (Dep. Plf at 200)). The parties reference this agreement as the First Assignment and the consideration paid was $10.00 by Snedeker. (Id.) The First Assignment provides that the Assignees will "perform all purchaser's obligations" as stated in the Purchase Agreement and indemnify Plaintiff in the event that they fail to perform those contractual obligations. (Doc. 74-3; Doc.135-5; Doc. 142-2 at 2). The First Assignment resulted in Plaintiff having a 50% interest in the marina purchase and Defendant Hix

---

[6] Defendant Hix, an attorney, was representing Plaintiff in another real estate litigation matter at that time.

[7] Defendant Hix testified that he put up $6,250 and Snedeker put up $6,250 for a total of $12,500 and that Plaintiff put up $12,500. (Doc. 135-4 (Dep. Hix at 136)). Defendant Hix testified that as of April 13, 2006, the money was a gift to the business venture because there was no executed contract between he, Snedeker and Plaintiff. (Id. at 142-144).

and Snedeker having the remaining 50% interest (each holding 25%).  (Doc. 146-4 at 51 (Dep. Plf at 200)).

Defendant Hix and Snedeker next endeavored to secure financing for the Purchase Agreement as neither they, nor Plaintiff, were in a position to provide the required $4 million.  In April 2006, Defendant Hix contacted Defendant M.J. Specchio ("Defendant Specchio"), as he had heard that Specchio participated in real estate investments and was actively looking for investment opportunities. (Doc. 135-4 (Dep. Hix at 55-56)). They envisioned the creation of a "dockominium" complex, selling the approximately 200 boat slips as a set price for a swift profit.  After discussing the marina purchase, on April 24, 2006, Defendant Hix and Snedeker conferred with Defendant Specchio via an e-mail entitled "Our Understanding" transmitted to Defendant Hix and Snedeker on that date.  (Doc. 74-3 at 47; Doc. 135-4 (Dep. Hix at 155-157, 160-163); Doc. 135-6 (Dep. Specchio at 51-52)).  Defendant Specchio's *proposal* for a business arrangement was that he would receive a 51% interest in the marina in return for providing all of the funding for the marina's purchase.  (Id.)  On April 25, 2006, Defendant Hix e-mailed Defendant Specchio and cc'd Snedeker, attaching a copy of the Purchase Agreement and the First Assignment.  (Doc. 74-3 at 51).

On April 26, 2006, a document entitled "Memorandum of Understanding- Romar Marina – April 25, 2006" was signed by Defendant Specchio.  (Doc. 135-15; Doc. 142-3).[8]  This Memorandum is an agreement among Defendant Hix, Snedeker and Defendant Specchio, for the

---

[8] There is no copy of this Memorandum showing all three signatures of Defendant Specchio, Defendant Hix and Snedeker.  However, Defendant Hix testified that the Memorandum was signed by him, Snedeker and Defendant Specchio by April 26, 2006.  (Doc. 135-4 (Dep. Hix at 67-68, 165, 170, 176)).  The execution of this document is also referenced in an e-mail sent from Defendant Hix to Snedeker and Defendant Specchio.   (Doc. 74-3 at 50).  The parties do not dispute that this Memorandum was signed and executed. However, Defendant Specchio testified that he did not know that he ever saw it signed by Defendant Hix and Snedeker.  (Doc. 135-6 (Dep. Specchio at 59)).

creation of a "Partnership Entity" (51% Specchio, 24.5% Hix, 24.5% Snedeker) that would be formed to "purchase, lease, and/or sell the subject property consisting of Romar Harbor High and Dry and/or other Marina Facility and Dry Storage facilities." (Id.) (Doc. 135-4 (Dep. Hix at 164-166, 176)). The Memorandum provides in relevant part

> . . . . Specchio will acquire the property known as . . . Marina in the amount of $4,000,000.00 and be responsible for the cash contributions and/or financing associated with the purchase, lease, operation and/or sale of the subject property . . . . Specchio will be responsible for reimbursement of Earnest money to Members Hix and Snedecker in the amount of $12,500.00, as well as payment of $25,000.00 ($12,500 of which is a reimbursement of his Earnest money) to Brad Lynn for assignment of contract rights.
>
> In the event that the purchase of the . . . Marina fails to consummate and the Earnest money paid to the Seller is refunded to Buyer, all Earnest money expended will be refunded to Specchio.  Furthermore, in the event that the agreement fails to consummate on or before May 8, 2006 and the earnest money is refunded, any additional consideration paid to Brad Lynn for the assignment of his interest will be refunded to Specchio.
>
> Specchio will also be responsible for payment of any additional consideration to Brad Lynn at closing; however, this amount and any other fees or expenses incurred by Specchio in the process of purchasing Romar or the initial startup of the purchasing entity will be considered a part of his cash investment. Members will be responsible for their pro rata share of any balloon payment to be made to Brad Lynn in two years.
>
> * * *
> **[EXECUTION TO FOLLOW]**
> * * *

(Id.)  The Memorandum shows no ownership interest for Plaintiff, and Plaintiff was not informed of the execution of this Memorandum – only that financing had been arranged.  (Doc. 135-4 (Dep. Hix at 164-166, 176)).

Based on this Memorandum, Defendant Hix and Snedeker agreed to enter into a separate partnership with Defendant Specchio through which Defendant Specchio would purchase the marina for $4 million and pay Plaintiff $25,000 for assignment of his contract rights with Plaintiff having

no ownership rights. (Doc. 135-15; Doc. 135-4 (Dep. Hix at 166); Doc. 135-6 (Dep. Specchio at 55-56)). There was no assignment of rights from either Defendant Hix and/or Snedeker to Defendant Specchio in this Memorandum. Additionally, Defendant Hix asserts that he did not assign his rights to the Purchase Agreement to anyone else, much less Defendant Specchio and/or Romar Marina Club, LLC.

On April 26, 2006, Defendant Specchio e-mailed Defendant Hix requesting that they sign, fax and mail originals because he was "not satisfied that the language is perfect yet on me having no exposure until we go hard; but we can address it in our next doc. I will wire immediately; but do not disperse until I have signatures." (Doc. 74-3 at 52). Between April 26, 2006 and May 3, 2006, Defendant Hix contacted AmSouth Bank to discuss financing of the purchase of the marina and arranged a meeting at the bank for May 2, 2006. (Doc. 74-3 at 53, 56; Doc. 135-4 (Dep. Hix at 178, 180-181)).

On May 3, 2006, Plaintiff executed an "Assignment of Contract Rights and Obligations with Defendant Hix whereby Plaintiff "transfers all his proportionate rights and obligations" as set forth in the Purchase Agreement to Defendant Hix, for a specified sum. (Doc. 135-7; Doc. 135-4 (Dep. Hix at 186-187, 189); Doc. 142-4; Doc. 146-4 at 56 (Dep. Plf at 218-219)). The parties reference this agreement as the Second Assignment. This Second Assignment provides as follows

> . . . . Assignor, Bradley A. Lynn now has bargained for Assignment which is made for full and valuable considerations in the amount of TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($25,000.00) paid by H. Ray Hix, Jr. (Hereinafter referred to as Assignee) to and received by Assignor, Bradley A. Lynn. **Future consideration** in the amount of THREE HUNDRED SEVENTY FIVE THOUSAND DOLLARS AND NO/100 ($375,000.00) **is to be paid to Brad Lynn if, and when, this transaction closes**. **In the event that this transaction closes, further future considerations will be paid to Brad Lynn** in the amount of $375,000 payable to Brad Lynn by H. Ray Hix, Jr. on or before May 22, 2008. **In the event that the**

> **closing, as described in the contract underlying this agreement,[9] fails to consummate on, or before, May 22, 2006, no consideration shall be paid and/or due to Bradley A. Lynn, his successors, and/or assigns**....

(Id. at 1-2 (emphasis added); Doc. 135-4 (Dep. Hix. at 171-172); Doc. 135-6 (Dep. Specchio at 95)).

Accordingly, the consideration to Plaintiff for this Second Assignment of rights was that Defendant Hix paid him $25,000 and then agreed further to pay Plaintiff two installments of $375,000, with the first $375,000 payment due "if and when" the Purchase Agreement deal closed, and the second payment on May 22, 2008 "in the event that this transaction closes."  Plaintiff contractually agreed to receive no payment in the event that the closing as described in the Purchase Agreement failed to consummate on or before May 22, 2006.  Defendant Hix paid Plaintiff the $25,000 by check.[10] (Doc. 93 at 18).  Through this Second Assignment, Plaintiff was giving up all of his contractual rights to Defendant Hix.  (Doc. 146-4 at 58 (Dep. Plf at 225-226, 228)).

On May 4, 2006, Defendant Hix notified the sellers of the marina that he had been assigned all of Plaintiff's contractual rights and obligations and would be taking title in the name of an unspecified entity.  (Doc. 135-13).  On May 8, 2006, Defendant Specchio formed Romar Marina Club, LLC.  (Doc. 135-10).  Defendant Hix also met with AmSouth Bank to discuss financing for the acquisition of the marina.  (Hix Dep. at 184).  On May 10, 2006, Defendant Specchio e-mailed Defendant Hix and Snedeker with a "Romar Marina Club, LLC Use of Funds Analysis" for their review.  (Doc. 74-3 at 71-72).  On May 12, 2006, Gulf Coast Title Company researched the title on

---

[9]  It is undisputed that the "contract underlying this agreement" refers to Plaintiff's initial purchase agreement with Marina Romar, Inc. – the Agreement.

[10]  Defendant Hix testified, however, that Defendant Specchio was actually responsible for payment of the $25,000 for the assignment of Plaintiff's rights as well as the $375,000 at closing.  (Doc. 135-4 (Dep.  Hix. at 173-174, 187)).  Defendant Hix testified that he did not inform Plaintiff that the money ($25,000 and the $375,000 at closing if it occurred on May 22, 2006 would be paid by Defendant Specchio).  (Doc. 135-4 (Dep. Hix. at 187-188)).

the property for Romar Marina Club, LLC in the amount of $4 million with Romar Marina Club, LLC as the proposed insured as to the owner's policy ($4 million) and the proposed insured being AmSouth Bank as to the mortgage policy ($2,250,000).  (Doc. 74-3 at 73-75).

On May 16, 2006, Marina Romar, Inc. (through Thomas Marr) executed an agreement with Romar Marina Club, LLC (Defendant Specchio) for the purchase of the marina for $3,975,000 on the condition that "[t]his Agreement only becomes valid if that agreement with Brad Lynn [or his Assigns-TMarr] fails to close on May 22, 2006 . . . ." [11]  (Doc. 142-5 at 3).  In other words, this was a "back-up contract" which could take effect only if and when Plaintiff's Purchase Agreement fell through.  (Id.)  The contract stated that time is of the essence with reference to all provisions.  (Id.)  The contract also provided that the closing shall be "on or no later than" May 24, 2006 and that Romar Marina Club, LLC would deposit earnest money in the sum of $10.00.  (Id.)  Also on May 16, 2006, Snedeker e-mailed Defendant Hix regarding the "Back up K," stating that the "terms need to be changed and the correct legal needs to be added."  (Doc. 74-3 at 111).

On May 17, 2006, Defendant Hix sent Defendant Specchio c/o Romar Marina Club, LLC a letter discussing environmental assessments "in preparation for your upcoming closing on the Romar Harbor Marina in Orange Beach, Alabama[.]" (Doc. 74-3 at 79).  On May 19, 2006, Gulf Coast Title Company issued the title commitment it had researched on May 12, 2006, insuring the amount of $4 million, with the proposed insured being Romar Marina Club, LLC.; the commitment required that certain conditions occur during a closing for the property to be insured, including the execution of a deed by Thurmon Bell ("Bell"), who was part owner of marina property.  (Doc. 74-3 at 73-75). On May 19, 2006, Bell, as Grantor, executed his portion of a deed conveying Parcel B of

---

[11] The "or his assigns-TMarr" portion was handwritten on the typed contract.

the marina property to Romar Marina Club, LLC, for the sum of $10.00.  (Doc. 135-8).

Before May 22, 2006, Defendant Hix and Snedeker discussed concerns over complications that were arising with the purchase of the marina with Defendant Specchio.  (Doc. 135-4 (Dep. Hix. at 226-227)).  Defendant Specchio testified that while there were concerns about not being able to secure certain documents for the bank in order to close on the marina, they did not make the decision that the closing would not be on the Purchase Agreement (but instead on Specchio's back-up contract) until they learned that they could not complete the transaction as contemplated due to not being able to secure 100% financing from the bank.  (Doc. 135-6 (Dep. Specchio at 101-104, 107)).  Defendant Specchio testified that the May 22, 2006 Purchase Agreement "died" because they were never able to accomplish the business objective.  (Id. at 133, 139).

At some point on May 22, 2006, Defendant Specchio, Defendant Hix and Snedeker executed another Agreement for marina operations around the Alabama Gulf Coast which provided that Defendant Specchio would have no obligation to Plaintiff and will be indemnified by Defendant Hix and Snedeker of such.  (Doc. 135-14).  This Agreement provides in relevant part as follows:

> WHEREAS, Ray and Haymes have brought a purchase agreement to Spec for Romar HiDry Marina in Orange Beach, Alabama and Spec has initially advanced $37,500 to Ray and Haymes for such, and
>
> WHEREAS, Ray and Haymes have another party, Brad Lynn (a person unknown to Spec) that may or may not participate in this venture; but to the extent Brad does, he will only have participation with any interest as extended to Ray and Haymes, and
>
> WHEREAS, Spec will have no obligation to Brad Lynn and will be indemnified by Ray and Haymes of such, and
>
> WHEREAS, Ray and Haymes desire Spec to lead the AGC marina project financially and will compensate Spec for this financial assistance, and
>
> WHEREAS, Ray and Haymes will work with Spec on other personal projects and lead the pursuit for more marina projects on the AGC.

NOW THEREFORE, it is hereby agreed by and between the PARTNERS as follows:

> 1. Spec will provide funding of $4,000,000 for the initial purchase of Romar HiDry Marina and Ray and Haymes will agree to a plan to compensate Spec with a onetime 25% incentive on this funding, prior to any other distribution.
> 2. Spec has formed Romar Marina Club, LLC, an Alabama entity and will issue 49% of the interest to Ray and Haymes or others as they will direct Spec.
> 3. That Ray and Haymes have or will execute any documentation necessary to assign all rights for purchase of Romar Hi-Dry Marina to Romar Marina Club, LLC or Spec.
> 4. That Spec will make available to Ray and Haymes (for prior services rendered and all current and future legal services to the project) loans of up to $300,000 in the event Ray and Haymes are required to meet any capital calls by Romar Marina Club, LLC and these funds will carry the same 25% incentive as all other funding provided by Spec.
>                                  * * *
> 7. That Ray and Haymes will provide Spec and Romar Marina Club, LLC with one or more agreements acceptable to Spec, evidencing that Brad Lynn has been satisfied or documentation that the marina purchase can be completed.
>                                  * * *
> 9. Ray and Haymes agree to continue pursuit of Marina property exclusively on behalf of Romar Marina Club, LLC.
>                                  * * *
> 11. **Ray and Haymes with their signature below agree personally to reimburse Spec immediately his $37,500 advance if for any reason this purchase of Romar HiDry Marina does not close within 10 days and then the PARTNERS will have no further liability or shared interests to each other**.
>                                  * * *

(Id. (emphasis added)).

On May 22, 2006, Plaintiff went to Defendant Hix's office, at which time Defendant Hix and Snedeker told Plaintiff, in a heated discussion, that "there was no such closing, that the deal had fell through and that I was not going to be paid at – what we agreed to."  (Doc. 146-4 at 62 (Dep. Plf at 243-244, 248-250, 260-274, 283)).  Plaintiff testified that he left the office and then talked with Defendant Hix on the phone shortly thereafter, at which time Defendant Hix told Plaintiff that he

was going to try and "make this right."  About an hour later, Defendant Hix and Snedeker produced

a memorandum of understanding to Plaintiff with new payment terms in order to compensate him.

(Id. at 261, 275-276).  This Memorandum of Understanding proposed a restructuring of Plaintiff's

payment (to take a deferred payment of $650,000 tied into other specifics such as the success of the

marina, etc.). (Doc. 135-12; Doc. 135-4 (Dep. Hix. at 218-219)).  Plaintiff refused to sign and

execute this Memorandum.  (Id. at 219, 323-324; Doc. 135-4 (Dep. Hix. at 193, 201, 204-206, 216,

227-228, 234-236, 322-324)).

At some point on May 22, 2006, Romar Marina Club, LLC and Defendant Specchio

executed closing documents at AmSouth Bank, including binding debt documents, dated May 22,

2006.  (Doc. 135-6 (Dep. Specchio at 112-113, 121-124, 128)).  The documents executed on May

22, 2006, by Specchio for Romar Marina Club, LLC included:

- A $2 million "Note for Business and Commercial Loans;"
- A $2,250,000 million mortgage from Defendant Romar Marina Club, LLC to AmSouth, with the handwritten date of "May 22, 2006" appearing on the 1st and last page of the document;
- A Mortgage Securing Guaranty by Defendant Specchio in favor of AmSouth, with Defendant Specchio signing directly above the handwritten, notarized date of "May 22, 2006";
- a Settlement Statement was prepared by AmSouth Bank for the financing of Romar Marina Club, LLC's purchase of the two parcels at the marina (Parcel B owned by Marr and Bell) and Parcel A (owned by Marina Romar, Inc.);[12]
- Specchio, as manager of Romar Marina Club, LLC, executed the "Assignment of Leases, Rents and Income" given as additional collateral for the debt secured by the mortgage given by Romar Marina Club LLC in favor of AmSouth"; and
- A Promissory Note for up to $250,000 with AmSouth, dated May 22, 2006, signed by Defendant Specchio for Defendant Romar Marina Club, LLC to AmSouth.  (Doc. 135-9; Doc. 142-10).

On May 23, 2006, Defendant Hix attended the closing with Defendant Specchio at Thomas

---

[12]  While signed by the Settlement Agent on 5/23/06, the document provides that the date of settlement was 5/22/06.

Marr's office.  (Doc. 135-4 (Dep. Hix. at 222, 324); Doc. 135-6 (Dep. Specchio at 159)).  Defendant

Specchio testified that as of May 23, 2006, he had never received an acceptable agreement signed

by Plaintiff, Snedeker and Defendant Hix and so "**at that point**, we didn't have a transaction."

(Doc. 135-6 (Dep. Specchio at 163-164) (emphasis added)).   Specifically, Defendant Specchio

testified that he went to Marr's office on that date, expecting them to show up with the agreement

signed by Plaintiff that had restructured his payment, but instead, they informed him that they had

not reached an agreement.  (Id. at 164-165).  Defendant Specchio testified that he still intended to

proceed with the transaction if Plaintiff had signed the new Memorandum of Understanding

restructuring his compensation upon closing – "[t]hat was the intent."  (Id. at 165).  However, that

did not occur.  Accordingly, on May 23, 2006, Thomas Marr, Sr., as Grantor, executed his portion

of the deed conveying Parcel B of the marina property to Romar Marina Club, LLC, as Grantee.

(Doc. 135-8).   Also on this date, Marina Romar, Inc. (through Thomas Marr) executed a deed on

behalf of the corporation to Romar Marina Club, LLC, conveying Parcel A of the marina property

to Romar Marina Club, LLC.  (Doc. 142-7).  Marina owners Bell and Marr then executed a

"Seller's/Owner's Affidavit" for Commonwealth Land Title Insurance Company and its agent Gulf

Coast Title Company to issue a title insurance policy.  (Doc. 142-11).

## II.   **Summary Judgment**

## A.   **Summary Judgment Standard**[13]

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[14]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making

---

[13]   The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. See, e.g., Gerling Global Reins. Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th Cir. 2001).  The Eleventh Circuit has held that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted).

[14]   Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).  The mere existence of any factual dispute, however, will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of the Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).


**B.    Discussion**

**1.    Plaintiff's Count One: Breach of Contract-Defendant Hix**

As noted in Ex parte Gardner, 822 So.2d 1211, 1217 (Ala. 2001) (citations omitted):

> "'Whether a contract is ambiguous is a question of law for the trial court to determine." . . . . In interpreting a contract, the "'words of the agreement will be given their ordinary meaning.'". . . . An "instrument is unambiguous if only one reasonable meaning clearly emerges.". . . . "If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment. However, if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury." . . . .

Alabama law construes contracts to give effect to the parties' intent and when a contract's terms are plain and unambiguous, there is no room for construction and the contract must be enforced as written.  See, e.g., Ex parte Conference America, Inc., 713 So.2d 953, 956 (Ala. 1998); Hall v. Am. Indemn. Group, 648 So.2d 556, 559 (Ala. 1994).  The general rule of contract law is that if a written contract exists, the parties' rights are controlled by that contract. Mobil Oil Corp. v. Schlumberger, 598 So.2d 1341, 1345-1346 (Ala. 1992).  The intent of the contracting parties is discerned from the

whole of the contract.  Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala. 2000). "It is well settled that where there is uncertainty and ambiguity in a contract, it is the duty of the court to construe the contract so as to express the intent of the parties."  BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So.2d 203, 216 (Ala. 2001).  The words of a clear and unambiguous assignment contract state the intentions of the parties and are binding as written.  See, e.g., Drummond Co. v. Walter Industries, Inc., 962 So.2d 753, 780 (Ala. 2006).

In Count One of the Third-Amended Complaint, Plaintiff alleges that "Defendant Hix breached his express and implied duty to perform" under the Second Assignment and/or in the alternative, that Defendant Hix breached the contracts by failing to close timely.  (Doc. 93 at ¶¶ 107, 109). Plaintiff alleges that these duties stem from the language in the Second Assignment whereby Hix purchased "all his [Brad Lynn's] proportionate rights and obligations as described in the contract for certain real property and improvements at the location commonly known as Romar Harbor Hi-Dri Marina, Orange Beach, Baldwin County, Alabama."  In his motion for summary judgment, Plaintiff asserts that "The Second Assignment was an enforceable contract without ambiguity and it should be enforced as a matter of law by the Court[]" and that "[i]t is irrelevant by Defendant Hix's own testimony that financing did not work out."  (Doc. 135 at 35-36).

The Court agrees the Second Assignment is unambiguous as to Plaintiff's right to receive additional compensation.  The Second Assignment clearly states that Defendant Hix's obligation to pay Plaintiff the additional compensation for the assignment of his contractual rights arose – *if and when* – the transaction closed.  Likewise, the unambiguous terms of the Second Assignment reveal further that if the closing as described in the Purchase Agreement did not consummate on or before May 22, 2006, Plaintiff would receive no additional compensation for the assignment of his

16

contractual rights.

Plaintiff argues that the closing actually took place on May 22, 2006, rather than May 23, 2006, because it was "in consummation" on May 22, 2006.  While it is undisputed that a number of documents were executed from May 19, 2006 through May 23, 2006 (including most on May 22, 2006), the actual deed which transferred the marina property was not fully executed until May 23, 2006.  According to BLACK'S LAW DICTIONARY (8th Ed. 2004), the term "consummate" means "**completed**,"  "**fully accomplished**," "**to bring to completion**," "to achieve" and "to fulfill."  (Id. (emphasis added)).  Additionally, BLACK'S LAW DICTIONARY (8th Ed. 2004) (emphasis added) defines a closing as "[t]he **final meeting** between the parties to a transaction, **at which the transaction is consummated**; *esp., in real estate*, **the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred**[.]"  As such, Plaintiff's "in consummation" argument is a non sequitur.  A transaction is either consummated/closed, or it is not.  See, e.g., Smith v. Neil, 2009 WL 1027081, *3 (Ala. Apr. 17, 2009) (not yet released for publication) (noting that the "allegation of an agreement to sell, even when taken as true, does not state that the agreement to sell was consummated. The allegation concerning Peter Neil's representation that he had taken all steps necessary to transfer National Life to Smith, even when taken as true, also falls short of stating that the sale to Smith was in fact consummated. Because the complaint fails to allege that Smith actually obtained any ownership interest in National Life, it fails to aver facts, which, if taken as true, are sufficient to establish Smith's standing to commence an action on behalf of National Life[]"); 161 Perdido Ventures, LLC v. Swervo Dev. Corp., 2008 WL 2351018, *1 n.2 (11th Cir. Jun. 10, 2008) (unpublished) (noting that because no title had passed, a purchase agreement had not been consummated); In re Geiger, 340

B.R. 422, 425 (M.D. Ga. 2006) (discussing that consummation means the execution of a deed and the transfer of interest in real property); In re Health Science Products, Inc., 183 B.R. 903, 924 (Bkrtcy. N.D. Ala. 1995) (citations omitted): "[a] deed, under Alabama law, is invalid until it is delivered to the grantee. [ ] Whether a deed has been delivered is a question of fact and depends entirely on the manifest intention of the grantor, which must be determined from circumstances surrounding the transaction. [ ] For there to be delivery, the grantor must intend for the deed to become presently effective and intend for his interest in the property to pass to the grantee." For purposes of a real estate purchase agreement, to consummate the transaction means the ultimate goal of exchanging title for money, not satisfying all the intermediate steps associated with achieving that ultimate goal[]"). See, e.g., Molstad v. Hovstone Properties Minnesota, LLC, 2008 WL 1971555, *3 (Minn. App. May 6, 2008) (unpublished). "[T]he general and the legal senses of 'consummate,' as well as the real estate term-of-art sense of 'closing,' all refer to achieving a goal rather than to satisfying intermediate steps associated with reaching that goal. And in the real estate closing context, the goal is the exchange of title for money . . . ." (Id. at *3). See also Beattie-Firth, Inc. v. Colebank, 105 S.E.2d 5, 9 (W. Va. 1958) (providing that "[i]n contracts . . . . the words 'consummation' or 'sale be consummated' mean the delivery of a deed of conveyance from the vendor to the vendee[]"). Thus, even though the process towards closing/consummation had begun before May 22, 2006, the final meeting and the final and full execution of the deeds, necessary to transfer ownership for the marina, occurred on May 23, 2006. It was thus on May 23, 2006 that Romar Marina Club, LLC acquired title.

Plaintiff also summarily states, without appropriate argument or citation to authority, that Defendant Hix breached his obligation to timely close. The Court has reviewed the Second

Assignment and finds no stated obligation for Hix to timely close.  To the extent Hix had an obligation under the assigned purchase agreement to "timely close," this obligation was owed to the Sellers not Plaintiff.

In sum, through the Second Assignment, Defendant Hix contractually agreed to pay Plaintiff $375,000 (plus) only if the marina Purchase Agreement transaction closed no later than May 22, 2006.  There was no obligation for Defendant Hix to perform under the Second Assignment because the conditions precedent to his obligation had not occurred.  Thus, as a matter of law Defendant Hix did not breach the contract.  Accordingly, Plaintiff's motion as to Count One against Defendant Hix is **DENIED** and Hix's motion as to Count One is **GRANTED.**

### 2. Plaintiff's Count Two: Breach of Contract -Defendant Specchio

In Count Two, Plaintiff alleges that Defendant Specchio breached a contract with Plaintiff based upon an executed Memorandum of Understanding providing to pay the debt of another and/or upon Plaintiff being named as an express third-party beneficiary.  Plaintiff asserts that in the Memorandum of Understanding  Specchio contracted to pay for the marina acquisition including the obligation to pay Plaintiff pursuant to the Second Assignment, *i.e.*, $375,000.

To recover as a third party beneficiary, the Plaintiff must show that: 1) the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party;  2) the complainant was the intended beneficiary of the contract; and 3) the contract was breached.  See, e.g., Ex parte ReLife, Inc., 679 So.2d 664, 668 (Ala. 1996).  Plaintiff's third-party beneficiary claim stems from the following language contained in the Memorandum of Understanding:

> Specchio will also be responsible for payment of any additional consideration paid to Brad Lynn at closing; however, this amount and any other fees or expenses incurred by Specchio in the process of purchasing Romar or the initial startup of the purchasing entity will be considered a part of his cash investment. Members will be

19

responsible for their pro rata share of <u>any</u> balloon payment to be made to Brad Lynn
in two years.

(Doc. 135-15 at 2 (emphasis added)).

Even assuming that Plaintiff could meet his burden to show that he was an intended third-party beneficiary to the Memorandum of Understanding, Plaintiff's motion fails for the same reasons articulated with regard to Plaintiff's breach of contract claim.[15]   This is because the condition precedent which may have triggered Defendant Specchio's obligation to pay additional consideration to Plaintiff never occurred.   Specifically, the obligation under the Second Assignment to pay Plaintiff additional consideration never came to fruition because the deal did not close by May 22, 2006.   Accordingly, as a matter of law Plaintiff can not prevail on his claim of breach of contract as a third-party beneficiary.

### III.   <u>Motion to Adopt and Motion to Strike</u> (Docs. 152, 153)

Plaintiff's motion to strike is based on the contention that the evidentiary documents (namely, Thomas Marr's Affidavit) purport to "supplement" Defendant Specchio's and Defendant Hix's opposition to summary judgment outside of the Court's extended response deadline of January 31, 2009 and were filed without leave, after the defendants' responses and after plaintiff's reply. Plaintiff's motion is due to be denied because while the documents were filed outside of the briefing deadline, nothing in the Thomas Marr Affidavit is "new" evidence. Marr's Affidavit simply restates evidence which had already been submitted to the Court.   Moreover, Plaintiff proceeded to file a responsive pleading to these filings and accordingly has had the opportunity to brief the issue for

---

[15] The Court notes that on the issue of whether Plaintiff is a third-party beneficiary, both parties have failed to provide adequate citation to law or argument applying the law to the facts.

this Court with regard to the evidentiary documents submitted.  As such, Plaintiff's motion to strike is **DENIED** and Defendant Specchio's Motion to Adopt Thomas Marr's Affidavit is **GRANTED**.

## IV.      Conclusion

For the reasons set forth herein, Plaintiff's motion for partial summary judgment as to Count One against Defendant Hix is **DENIED** and Hix's motion for summary judgment as to Count One is **GRANTED.**  Plaintiff's motion for partial summary judgment as to Count Two against Defendant Specchio is **DENIED** and Specchio's motion for summary judgment as to Count Two is **GRANTED.**

**DONE** and **ORDERED** this the **8**[th] day of **July 2009.**

/s/ Kristi K. DuBose_____
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**