**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRAD LYNN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 07-0173-KD-C** |
| **ROMAR MARINA CLUB, LLC.,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on Defendants Michael Specchio and Romar Marina Club,

LLCs' motion for summary judgment (Docs. 250-252), Plaintiff Brad Lynn's motion for summary

judgment as to Hix' counterclaims (Docs. 253-254, 263), Defendant H. Ray Hix, Jr.'s motion for

summary judgment (Docs. 256-258), Defendant HSK Properties, LLC's motion for summary

judgment (Docs. 259-260, 262), and the responses, replies and exhibits thereto (Docs. 268-282).

**I.    Background**

**A.    Procedural**

Plaintiff Brad Lynn ("Lynn") initiated this litigation on March 6, 2007. (Doc. 1). Lynn filed

an amended complaint on May 3, 2007 (Doc. 10), and on December 17, 2007, amended the

complaint for a second time to add Defendant HSK Properties, LLC (Doc. 44). HSK filed a motion

for partial dismissal on February 19, 2008. (Doc. 66). In response, Lynn filed a motion to amend

the complaint for a third time. (Doc. 74). The Court granted the motion to amend and granted in part

and denied in part HSK's motion to dismiss. (Doc. 92). Lynn's Third Amended Complaint, filed

on April 24, 2008, alleges claims against Defendant Hix, Defendant Specchio, Defendant RMC and

Defendant HSK as follows: breach of contract against Hix (count one); breach of contract against Specchio (count two); Alabama Legal Services Liability Act ("ALSLA") breach of standard of care against Hix (count three); fraudulent suppression against Hix and HSK (count four); breach of fiduciary duty against Hix and HSK (count five); breach of fiduciary duty against Specchio and RMC (count six), wantonness against Hix, HSK, Specchio and RMC (count seven); interference with business/contractual relations against Specchio and RMC (count eight); promissory fraud against Hix and Specchio (count nine); negligent loss/intentional destruction against Hix, HSK, Specchio and RMC (count ten); conversion against Hix, HSK, Specchio and RMC (count eleven); and civil conspiracy against Hix, HSK, Specchio and RMC (count twelve).  (Doc. 93).  In May 2008, the defendants filed their answers and Hix asserted counterclaims against Lynn for fraud and breach of a confidentiality contract.  (Docs. 96-98, 102).

In January 2009, Hix and Specchio moved for partial summary judgment on the breach of contract claims. (Docs. 135, 142-143, 146-148, 150-156).  On July 8, 2009, this Court granted partial summary judgment in favor of Hix and Specchio with regard to Lynn's breach of contract claims (counts one and two).  (Doc. 247).

**B.**   **Factual**

   **1.**   **Relevant Individuals and Entities**

Plaintiff Brad Lynn ("Lynn") is a citizen of the State of Nevada.  (Doc. 93 at 1).  Lynn was a client of Defendant Hix and his law firm Hix & Snedeker, LLC.  (Id. at 2; Doc. 275-1 (Dep. B.Lynn at 74-89, 92, 94-109)).  The firm represented Lynn in a variety of situations including drafting articles of organization for Lynn to become a Ben & Jerry's franchise and representing Lynn  on a traffic ticket and with regard to land litigation in Baldwin County, Alabama.  (Id)

Defendant H. Ray Hix, Jr. ("Hix") is a citizen of the State of Alabama and an attorney at the law firm of Hix & Snedeker, LLC, in Gulf Shores, Alabama, where he practices with Haymes S. Snedeker ("Snedeker").  (Doc. 93; Doc. 102 at 1).  Hix' firm represented Lynn in certain legal matters.  (Doc. 93 at 2; Doc. 102).  Hix is a member of HSK Properties, LLC.  (Doc. 102 at 2).

Defendant HSK Properties, LLC ("HSK") is an Alabama limited liability company formed on January 25, 2005, whose original members were Hix, Snedeker, Kerry Klarfeld, Linda Swaney and Shaun Hayes.[1]  (Doc. 93 at 1; Doc. 98 at 1; Doc. 260-1; Doc. 260-2 (Aff. Klarfeld at ¶4); Doc. 260-3 (Dep. R.Hix at 34-37); Doc. 260-4 (Dep. H.Snedeker at 8)).  Hix and Snedeker remain members of HSK.  (Doc. 260-3 (Dep. R.Hix at 267-268); Doc. 260-4 (Dep. H.Snedeker at 43, 241); Doc. 260-1 at 2).  Hix was HSK's registered agent.  (Doc. 260-1 at 1; Doc. 260-5 at 5).  On February 17, 2005, the members and manager of HSK executed the HSK Operating Agreement.  (Doc. 260-5).  Klarfeld has been the manager of HSK since 2005; there have been no other managers.  (Doc. 260-5 at 25; Doc. 260-3 (Dep. R.Hix at 275); Doc. 260-6 (Dep. K.Klarfeld at 12-13)).  The HSK Operating Agreement permits its members and manager to own, purchase and sell real property in their individual capacities without control, oversight or a right of first refusal.  (Doc. 260-5 at 18-21; Doc. 260-4 (Dep. H.Snedeker at 247-249); Doc. 260-6 (Dep. K.Klarfeld at 59)).  The Operating Agreement controls the duties and obligations of the manager and members of HSK.  (Doc. 260-3 (Dep. R.Hix at 273)).  Hix had no power or authority to bind or obligate HSK (in contrast to HSK's manager).  (Id. at 276-278, 304).  Indeed, HSK's Operating Agreement provided that the

---

[1] Lynn suggests that HSK's only "natural" members were Hix and Snedeker, and that the only other member was another LLC, Gulf Investors, LLC (citing Klarfeld's deposition).  (Doc. 278 at 1).  Snedeker testified that apart from himself and Hix, the only other member was Gulf Investors LLC, but then next testified that another individual, Shaun Hayes, is the third member of HSK.  (Doc. 260-4 (Dep. H.Snedeker at 43-44)).

management and control of HSK and its business operations rested exclusively with its manager Klarfeld and that members who are not managers (*i.e.*, Hix) "shall not participate in the day-to-day control of the business affairs of the LLC, transact any business on behalf of the LLC, or have any power or authority to bind or obligate the LLC." (Doc. 260-5 (Section 3.5)). HSK members could only receive power and authority to act on behalf of the LLC under specific circumstances (specific grant, approval proposal or written consent/resolution). (Id. (Article 6)). Neither Hix nor Snedeker believed that they had charge of HSK's daily affairs or the routine, ordinary management and control of HSK's business. (Doc. 260-3 (Dep. R.Hix at 276-277); Doc. 260-4 (Dep. H.Snedeker at 245-246)). HSK had no involvement in the marina transaction and never held an interest in the marina or discussed the marina matter with Hix. (Doc. 260-3 (Dep. R.Hix at 48, 277); Doc. 260-4 (Dep. H.Snedeker at 12-13, 246); Doc. 260-2 (Aff. Klarfeld at ¶¶6, 8, 14, 15, 22); Doc. 260-7 (Dep. M.Specchio at 200-201)).

Defendant Michael Specchio ("Specchio") is a real estate investor and citizen of the State of Illinois. (Doc. 93 at 1-2; Doc. 251-6 (Aff. Specchio at ¶4)). Defendant Romar Marina Club, LLC ("RMC") is an Alabama limited liability company which was formed on May 9, 2006, with Specchio as the sole member. (Doc. 96 at 10 at ¶68; Doc. 251-6 (Aff. Specchio at ¶2)).

Non-party Haymes S. Snedeker ("Snedeker") is an attorney at the law firm of Hix & Snedeker, LLC, in Gulf Shores, Alabama; he is the law partner of Hix. (Doc. 260-4 (Dep. H.Snedeker at 7-8); Doc. 260-3 (Dep. R.Hix at 19-20)). Non-party Shellbank Holdings, LLC ("Shellbank Holdings") is an Alabama limited liability company whose members are Hix and Snedeker. (Doc. 260-3 (Dep. R.Hix at 34); Doc. 269-3). HSK has no ownership interest in Shellbank. (Doc. 260-3 (Dep. R.Hix at 46); Doc. 260-2 (Aff. Klarfeld at ¶10)).

4

2.      **Relevant History**

On October 26, 2005, Lynn signed a 40% contingency fee contract with Defendant H. Ray Hix, Jr. ("Hix") to have the law firm of Hix & Snedeker represent the Estate of Jason Lynn, Lynn's brother, who had been killed by a drunk driver.  (Doc. 102 at 2-3).  Hix subsequently learned that Lynn's father had already initiated litigation for the case and that Lynn had no right to pursue the action.  (Id. at 3).  Hix terminated the employment contract with Lynn through a November 21, 2005 letter and the law firm no longer represented Lynn with respect to that matter after November 21, 2005.  (Id.)  Representation of Lynn continued on other matters, however, as evidenced on February 27, 2006, when Hix and Snedeker wrote Lynn regarding the real estate assignment "we drafted at your request" including his letter for "invoices for the power of attorney and Caribe Closing."  (Id.) See also (Doc. 269-3).

On March 3, 2006, Lynn presented a signed a purchase agreement offer to Thomas Marr ("Marr") of Romar Marina, Inc., one-half owner of the Romar Harbor Marina in Orange Beach, Alabama, to purchase the marina for $4 million.  (Doc. 93 at 7; Doc. 260-9 (Dep. B.Lynn at 123-124, 129-130); Doc. 269-4).  There is nothing in the record indicating that Marina Romar, Inc. accepted this offer within the time frame allowed; thus, it appears to have expired by operation of its terms. On April 3, 2006, Gulf Coast Title Company issued a Commitment, representing Commonwealth Land Title Insurance Company, regarding Plaintiff as the proposed insured, in the amount of $4 million for Parcels A-B of the marina, which was countersigned on April 14, 2006. (Doc. 269-5).

On April 5, 2006, Lynn paid the sum of $5,000 to the trust account of Hix & Snedeker, LLC for continuing legal services.  Lynn testified that he was told that this sum covered him for any type

of legal matters that might arise. (Doc. 260-9 (Dep. B.Lynn at 278-279); Doc. 269-8). On April 10, 2006, Hix and Snedeker filed a civil complaint in the Circuit Court of Baldwin County, Alabama on Lynn's behalf (Bradley A. Lynn v. Donald L. McDole, et al.). (Doc. 102 at 4; Doc. 269-6).

On April 12, 2006, Lynn executed a contract with Marina Romar, Inc. (with Marr, its President), to purchase the Romar Harbor Marina in Orange Beach, Alabama ("the marina") for $4 million (the "Purchase Agreement"). (Doc. 251-1; Doc. 257-1; Doc. 260-9 (Dep. B.Lynn at 150-156); Doc. 269-7; Doc. 269-11). As part of the Purchase Agreement, the parties agreed in pertinent part as follows: Lynn would pay $25,000 in earnest money; the closing shall be on or no later than May 22, 2006; Lynn has 31 days from April 12, 2006, to do due diligence; in the event that Lynn assigns the Agreement, he shall give written notice to the seller no less than three days before closing; and in the event that either Lynn or seller do not terminate the agreement on or before May 8, 2006 but fail to consummate the Agreement, each would have the right to pursue any remedy available at law or in equity as a result of such breach. The Purchase Agreement provided further for Lynn to deposit the $25,000 with third-parties Marr and Friedlander Attorneys as earnest money in consideration for the contract. The Purchase Agreement specified that "[t]ime is of the essence with reference to all provisions contained herein." The Purchase Agreement does not provide any provision indicating that the purchase is contingent on obtaining financing.

Lynn discussed the marina Purchase Agreement with attorney Defendant H. Ray Hix, Jr. ("Hix") and Hix' law partner Haymes Snedeker ("Snedeker"). (Doc. 260-4 (Dep. H.Snedeker at 232-233)). Hix and Snedeker were interested in participating in the marina transaction with Lynn such that an assignment of rights to the Purchase Agreement would need to be executed. As a result, they came to an agreement whereby on April 12, 2006, Lynn paid one-half or $12,500 of the

$25,000 due in earnest money to Hix – which was then deposited into a Shellbank Holdings account at Vision Bank – and on April 13, 2006, Snedeker drafted a Shellbank Holdings company check for $25,000 made payable to the marina seller's trust account Marr and Friedlander Attorney-Trust Account and delivered it to Marr.[2] (Doc. 260-9 (Dep. B.Lynn at 184, 186, 188); Doc. 260-4 (Dep. H.Snedeker at 118); Doc. 260-10).  Snedeker testified that their involvement "had absolutely nothing to do with the practice of law.  I indicated that to Brad Lynn, that his solicitation to me and Ray Hix to be involved in the marina deal was a personal investment . . . . I explained to him we're not using law firm accounts or anything, this has nothing to do with us being lawyers, this is a personal investment. And that's how the initial deposit of the funds went down;]" and that Lynn "solicited participation in this private investment as private individuals, me and Ray . . . ." (Doc. 257-9 (Dep. H.Snedeker at 118); Doc. 260-4 (Dep. H.Snedeker at 118, 233)).

However, according to Lynn, he wrote the check for $12,500 made payable to Hix & Snedeker, and Hix and Snedeker were to prepare the assignment and then pay the other $12,500. Lynn testified that "[t]hey were telling me what to do and I did it[-]" "[t]hey were my counsel, yes, sir." (Doc. 260-9 (Dep. B.Lynn at 184-185, 188, 203, 226)).  "They were my attorneys and I trusted them." (Id. at 185).

Lynn's $12,500 check was not deposited into an account held or owned by HSK. (Doc. 260-3 (Dep. R.Hix at 307); Doc. 260-2 (Aff. K.Klarfeld at ¶11)).  HSK did not contribute any funds toward the $25,000 Shellbank Holdings check. (Doc. 260-4 (Dep. H.Snedeker at 250); Doc. 260-2 (Aff. K.Klarfeld at ¶12)).  Hix never discussed with HSK about the acquisition of the marina. (Doc.

---

[2]  Hix testified that he put up $6,250 and Snedeker put up $6,250 for a total of $12,500 and that Lynn put up $12,500.  (Doc. 275-2 (Dep. Hix at 136)).  Hix testified that as of April 13, 2006, the money was a "gift" to the business venture because there was no executed contract between him, Snedeker and Lynn. (Id. at 142-144).

260-3 (Dep. R.Hix at 48); Doc. 260-2 (Aff. K.Klarfeld at ¶¶14, 15, 22)).

On April 18, 2006, Hix & Snedeker billed Lynn for legal work on the <u>McDole</u> case. (Doc. 269-12).

On April 21, 2006, Lynn, Hix and Snedeker executed a contract entitled "Assignment of Contract Rights and Obligations." (Doc. 251-2; Doc. 260-9 (Dep. B.Lynn at 199-200); Doc. 269-13). This contract provided that Lynn would "transfer[] all rights and obligations" as described therein (concerning the property rights to the marina) to Hix, Snedeker and Lynn (as Assignees collectively). (Doc. 269-13). <u>See also</u> Doc. 260-9 (Dep. B.Lynn at 200-201)). The parties reference this agreement as the First Assignment. (Doc. 269-13). The First Assignment provided that the Assignees will "perform all purchaser's obligations" as stated in the Purchase Agreement and indemnify Lynn in the event that they fail to perform those contractual obligations. (Id.) The First Assignment resulted in Lynn having a 50% interest in the marina purchase and Hix and Snedeker having the remaining 50% interest (each holding 25%). (Doc. 260-9 (Dep. B.Lynn at 200); Doc. 275-2 (Dep. R.Hix at 131, 139)). HSK was not a party to the First Assignment and it was never assigned to, or sent to, HSK. (Doc. 260-3 (Dep. R.Hix at 278); Doc. 260-2 (Aff. K.Klarfeld at ¶13)).

Hix contacted Taylor Engineering, LLC to conduct a Phase I Environmental Assessment of the marina. Hix did not identify HSK as the client and as of April 14, 2006, Joe Taylor (Vice-President of Taylor Engineering) believed that Hix – *not HSK* – was the client. (Doc. 260-3 (Dep. R.Hix at 285); (Doc. 260-12 (Aff. Cunningham at ¶¶3-7); Doc. 260-20 (Aff. Taylor at ¶¶2, 8)).[3] Nevertheless, the cover page of the Phase I Environmental Site Assessment contained the words

---

[3] Based on a conversation that Cunningham had with Specchio, he believed that either Specchio or RMC was the borrower financing the marina purchase. (Doc. 260-12 (Aff. Cunningham at ¶12)).

"Prepared for HSK Properties, Attn: Mr. Ray Hix." (Doc. 260-12 (Aff. Cunningham)).  Hix asserts

that this was an error because Taylor Engineering had performed work for HSK in the past.  (Doc.

260-3 (Dep. R.Hix at 287-288)).  The cover page was amended to reflect the correct client – RMC.

(Doc. 260-12 (Aff. Cunningham at ¶10); Doc. 260-3 (Dep. R.Hix at 298-299); Doc. 260-20 (Aff.

Taylor at ¶10)). RMC paid for the assessment.  (Doc. 260-7 (Dep. M.Specchio at 192, 198); Doc.

260-3 (Dep. R.Hix at 297-298, 300-301); Doc. 260-29).

       Hix and Snedeker next endeavored to secure financing for the Purchase Agreement as neither

they, nor Lynn, were in a position to provide the $4 million purchase price.  Hix informed Lynn that

he would try to procure financing.  (Doc. 260-3 (Dep. R.Hix at 157, 160-161)). In April 2006, Hix

contacted Defendant Michael J. Specchio ("Specchio") as he had heard that Specchio participated

in real estate investments and was actively looking for investment opportunities. (Doc. 275-2 (Dep.

Hix at 55-56); Doc. 260-4 (Dep. H.Snedeker at 120)).   Hix envisioned the creation of a

"dockominium" complex, selling the approximately 200 boat slips as a set price for a swift profit.

After discussing the marina purchase, on April 24, 2006, Hix and Snedeker conferred with Specchio

via an e-mail from Specchio with the subject line "Our Understanding" transmitted to Hix and

Snedeker.  (Doc. 269-14).  Specchio's *proposal* for a business arrangement was that he would

receive a 51% interest in the marina in return for providing all of the funding for the marina's

purchase.  (Id.) On April 25, 2006, Hix e-mailed Specchio and cc'd Snedeker attaching the Purchase

Agreement and the First Assignment.  (Doc. 269-15).

       On April 26, 2006, a document entitled "Memorandum of Understanding- Romar Marina –

April 25, 2006" was signed by Specchio.  (Doc. 251-3; Doc. 257-2; Doc. 269-19; Doc. 269-21).[4]

This Memorandum was an agreement among Hix, Snedeker and Specchio for the creation of a

"Partnership Entity" (51% Specchio, 24.5% Hix, 24.5% Snedeker) that would be formed to

"purchase, lease, and/or sell the subject property consisting of Romar Harbor High and Dry and/or

other Marina Facility and Dry Storage facilities." (Id.) The Memorandum provides in relevant part:

> . . . . Specchio will acquire the property known as . . . Marina in the amount of
> $4,000,000.00 and be responsible for the cash contributions and/or financing
> associated with the purchase, lease, operation and/or sale of the subject property . .
> . . Specchio will be responsible for reimbursement of Earnest money to Members Hix
> and Snedeker in the amount of $12,500.00, as well as payment of $25,000.00
> ($12,500 of which is a reimbursement of his Earnest money) to Brad Lynn for
> assignment of contract rights.
>
> In the event that the purchase of the . . . Marina fails to consummate and the Earnest
> money paid to the Seller is refunded to Buyer, all Earnest money expended will be
> refunded to Specchio.  Furthermore, in the event that the agreement fails to
> consummate on or before May 8, 2006 and the earnest money is refunded, any
> additional consideration paid to Brad Lynn for the assignment of his interest will be
> refunded to Specchio.
>
> Specchio will also be responsible for payment of any additional consideration to
> Brad Lynn at closing; however, this amount and any other fees or expenses incurred
> by Specchio in the process of purchasing Romar or the initial startup of the
> purchasing entity will be considered a part of his cash investment. Members will be
> responsible for their pro rata share of any balloon payment to be made to Brad Lynn
> in two years.
>
> * * *
> **[EXECUTION TO FOLLOW]**
> * * *

The Memorandum shows no ownership interest for Lynn, and Lynn was not informed of the

execution of this Memorandum – only that financing had been arranged.  (Doc. 275-2 (Dep. Hix at

164-166, 176)).  Specchio testified that he fully intended to perform pursuant to the Memorandum

---

[4] There is no copy of this Memorandum showing all three signatures of Specchio, Hix, and
Snedeker; however, as noted in the prior order ruling on the partial motion for summary judgment, Hix,
Snedeker and Specchio admitted to signing the document.  (Doc. 247 at 5, n.8).

at the time it was executed.  (Doc. 251-4 (Dep. M.Specchio at 71, 77)).  HSK was not a party to this Memorandum, and moreover, it was never assigned or sent to HSK.  (Doc. 260-3 (Dep. R.Hix at 278; Doc. 260-7 (Def. M.Specchio at 200-201); Doc. 260-2 (Aff. Klarfeld at ¶17)).

 Based on this Memorandum, Hix and Snedeker agreed to enter into a future partnership with Specchio through which Specchio would purchase the marina for $4 million and pay Lynn $25,000 for assignment of his contract rights with Lynn having no ownership rights.  (Doc. 275-2  (Dep. R.Hix at 166); Doc. 275-3 (Dep. M.Specchio at 55-56)).  There was no assignment of rights from either Hix and/or Snedeker to Specchio through this Memorandum.

Hix told Lynn that he had a financier for the marina purchase and that Hix may try to negotiate Lynn out of the contract.  Lynn acknowledged that such an arrangement would be "okay." (Doc. 257-7 (Dep. B.Lynn at 217-218); Doc. 260-9 (Dep. B.Lynn at 217-218)).  Lynn never saw the Memorandum, and Specchio, Hix and Snedeker never told him of its existence.  (Doc. 251-5 (Dep. B.Lynn at 349-351)).  Lynn did not know who was to provide the financing.  (Id. at 344-345). Indeed, Specchio testified that he never met Lynn or had any communications with Lynn.  (Doc. 251-4 (Dep. M.Specchio at 41, 63)).

On April 26, 2006, Specchio e-mailed Hix requesting that they sign, fax and mail originals because he was "not satisfied that the language is perfect yet on me having no exposure until we go hard; but we can address it in our next doc. I will wire immediately; but do not disperse until I have signatures."  (Doc. 270-2).

Hix was never employed by either Specchio or RMC, however Hix performed preparation work for the purchase of the marina.  (Doc. 251-6 (Aff. M.Specchio at ¶¶5-6)).  According to Specchio, it was because Hix was "in close proximity" to the marina that he performed several tasks

11

related to the contemplated purchase.  (Id. at ¶5).  Specchio attests that neither he nor RMC "ever

exercised control over Hix relating to the tasks performed in conjunction with the purchase".  (Id.

at ¶6).  Hix also secured an environmental assessment and property survey.  (Doc. 251-7 (Dep.

R.Hix at 283)).  Additionally, between April 26, 2006 and May 3, 2006, Hix contacted AmSouth

Bank to discuss financing of the purchase of the marina and arranged a meeting at the bank in May

2006.  (Doc 270-8).

On May 3, 2006, Lynn executed an "Assignment of Contract Rights and Obligations"

whereby Lynn "transfers all his proportionate rights and obligations" as set forth in the Purchase

Agreement to Hix, for a specified sum.  (Doc. 251-8; Doc. 257-4; Doc. 271-2).  The parties

reference this agreement as the Second Assignment, which provides as follows

> . . . . Assignor, Bradley A. Lynn now has bargained for Assignment which is made
> for full and valuable considerations in the amount of TWENTY FIVE THOUSAND
> AND NO/100 DOLLARS ($25,000.00) paid by H. Ray Hix, Jr. (Hereinafter referred
> to as Assignee) to and received by Assignor, Bradley A. Lynn. Future consideration
> in the amount of THREE HUNDRED SEVENTY FIVE THOUSAND DOLLARS
> AND NO/100 ($375,000.00) is to be paid to Brad Lynn if, and when, this transaction
> closes.  In the event that this transaction closes, further future considerations will be
> paid to Brad Lynn in the amount of $375,000 payable to Brad Lynn by H. Ray Hix,
> Jr. on or before May 22, 2008.  In the event that the closing, as described in the
> contract underlying this agreement,[5] fails to consummate on, or before, May 22,
> 2006, no consideration shall be paid and/or due to Bradley A. Lynn, his successors,
> and/or assigns . . . .

Accordingly, the consideration to Lynn for this Second Assignment of rights was that Hix

paid him $25,000 and then agreed further to pay Lynn two installments of $375,000, with the first

$375,000 payment due "if and when" the Purchase Agreement deal closed, and the second payment

on May 22, 2008 "in the event that this transaction closes."  (Doc. 260-9 (Dep. B.Lynn at 219, 225)).

---

[5] It is undisputed that the "contract underlying this agreement" refers to Lynn's initial purchase
agreement with Marina Romar, Inc. – the Agreement.

Lynn contractually agreed to receive no payment in the event that the closing as described in the Purchase Agreement failed to consummate on or before May 22, 2006. Through this Second Assignment, Lynn gave up all of his contractual rights to purchase the marina. (Doc. 260-9 (Dep. B.Lynn at 225-226, 228)). Lynn was not told about Specchio at that time. Lynn only knew that an unnamed source would provide the financing. (Doc. 251-5 (Dep.B.Lynn at 344-345)). HSK was not a party to this Second Assignment, and moreover, the Second Assignment was never sent to HSK. (Doc. 260-3 (Dep. R.Hix at 278); Doc. 260-2 (Aff. Klarfeld at ¶18)).

On or about May 3, 2006, Lynn received a $25,000 check from Hix, as partial consideration for his assignment of rights.[6] (Doc. 260-9 (Dep. B.Lynn at 290); Doc. 260-3 (Dep. R.Hix at 171-172); Doc. 260-4 (Dep. H.Snedeker at 28, 140)). On May 4, 2006, Hix notified the sellers of the marina that he had been assigned all of Lynn's contractual rights and obligations and would be taking title in the name of an unspecified entity. (Doc. 271-3).

On May 6, 2006 Lynn and Hix executed a Confidentiality Agreement. (Doc. 271-1). Lynn asserts that the purpose of this agreement was to prevent Lynn from discussing in public the plans for marketing the marina.

On May 9, 2006, the Articles of Organization for Romar Marina Club, LLC ("RMC"), with Specchio as its initial registered agent, were filed in the Baldwin County Probate Court. (Doc. 271-11). On May 10, 2006, Specchio e-mailed Hix and Snedeker with a "Romar Marina Club, LLC Use of Funds Analysis" for their review, discussing options to purchase other marinas in the Gulf Shores area in different phases. (Doc. 271-13; Doc. 271-14).

_____

   [6] Hix testified, however, that Specchio was actually responsible for payment of the $25,000 for the assignment of Lynn's rights as well as the $375,000 at closing. (Doc. 275-2 (Dep. R.Hix. at 173-174, 187)). Hix testified that he did not inform Lynn that the money ($25,000 and the $375,000 at closing if it occurred on May 22, 2006 would be paid by Specchio). (Id. at 187-188)).

On May 16, 2006, Marina Romar, Inc. (through Marr) executed an agreement with RMC (through Specchio) for the purchase of the marina for $3,975,000, on the condition that "[t]his Agreement only becomes valid if that agreement with Brad Lynn [or his Assigns-TMarr] fails to close on May 22, 2006 . . . ." [7]  (Doc. 251-9; Doc. 271-19).  This was a "back-up contract" which could take effect only if and when Lynn's Purchase Agreement fell through.  The contract stated that time is of the essence with reference to all provisions.  The contract provided that the closing shall be "on or no later than" May 24, 2006 and that RMC would deposit earnest money in the sum of $10.00.  Also on May 16, 2006, Snedeker e-mailed Hix regarding the "Back up K," stating that the "terms need to be changed and the correct legal needs to be added."  (Doc. 271-20).  On May 17, 2006, Hix sent RMC c/o Specchio a letter discussing environmental assessments "in preparation for your upcoming closing on the Romar Harbor Marina in Orange Beach, Alabama[.]" (Doc. 272-3).

On May 19, 2006, Gulf Coast Title Company issued a commitment for title insurance on the property for proposed insured RMC, in the amount of $4 million. (Doc. 271-16).  AmSouth Bank, as the loan source, was insured under the title insurance commitment for the mortgage of $2,250,000. (Id.)  The commitment required that certain conditions occur before closing in order for the property to be insured, including the execution of a deed by Thurmon Bell ("Bell"), who was part owner of marina property.  (Doc. 247 at 9 (citing Doc. 74-3 at 73-75)). On May 19, 2006, Bell, as Grantor, executed his portion of a deed conveying Parcel B of the marina to RMC for the sum of $10.00.  (Id. (citing Doc. 135-8)).

Before May 22, 2006, Hix and Snedeker discussed with Defendant Specchio concerns over complications that were arising with the purchase of the marina.  (Doc. 275-2 (Dep. R.Hix. at 226-

---

[7] The "or his assigns-TMarr" portion was handwritten on the typed contract.

227)).  Specchio testified that there were concerns about not being able to secure certain documents

for the bank in order to close on the marina.  (Doc. 275-3 (Dep. M.Specchio at 101-104, 107))

However they did not make the decision that the closing would not be on the Purchase Agreement

(but instead on Specchio's back-up contract) until they learned that they could not complete that

transaction as contemplated due to not being able to secure 100% financing from the bank.  (Id.)

Specchio testified that it was at that point the Purchase Agreement "died."  (Id. at 132-33, 139).

On May 22, 2006, Specchio, Hix and Snedeker executed another Agreement for marina

operations around the Alabama Gulf Coast which provided that Specchio would have no obligation

to Lynn and will be indemnified by Hix and Snedeker of such.  (Doc. 272-16):

> WHEREAS, Ray and Haymes have brought a purchase agreement to Spec for Romar
> HiDry Marina in Orange Beach, Alabama and Spec has initially advanced $37,500
> to Ray and Haymes for such, and
>
> WHEREAS, Ray and Haymes have another party, Brad Lynn (a person unknown to
> Spec) that may or may not participate in this venture; but to the extent Brad does, he
> will only have participation with any interest as extended to Ray and Haymes, and
>
> WHEREAS, Spec will have no obligation to Brad Lynn and will be indemnified by
> Ray and Haymes of such, and
>
> WHEREAS, Ray and Haymes desire Spec to lead the AGC marina project
> financially and will compensate Spec for this financial assistance, and
>
> WHEREAS, Ray and Haymes will work with Spec on other personal projects and
> lead the pursuit for more marina projects on the AGC.
>
> NOW THEREFORE, it is hereby agreed by and between the PARTNERS as follows:
>
>> 1. Spec will provide funding of $4,000,000 for the initial purchase of
>> Romar HiDry Marina and Ray and Haymes will agree to a plan to
>> compensate Spec with a onetime 25% incentive on this funding, prior
>> to any other distribution.
>> 2. Spec has formed Romar Marina Club, LLC, an Alabama entity and
>> will issue 49% of the interest to Ray and Haymes or others as they
>> will direct Spec.

3. That Ray and Haymes have or will execute any documentation necessary to assign all rights for purchase of Romar Hi-Dry Marina to Romar Marina Club, LLC or Spec.

4. That Spec will make available to Ray and Haymes (for prior services rendered and all current and future legal services to the project) loans of up to $300,000 in the event Ray and Haymes are required to meet any capital calls by Romar Marina Club, LLC and these funds will carry the same 25% incentive as all other funding provided by Spec.

* * *

7. That Ray and Haymes will provide Spec and Romar Marina Club, LLC with one or more agreements acceptable to Spec, evidencing that Brad Lynn has been satisfied or documentation that the marina purchase can be completed.

* * *

9. Ray and Haymes agree to continue pursuit of Marina property exclusively on behalf of Romar Marina Club, LLC.

* * *

11. Ray and Haymes with their signature below agree personally to reimburse Spec immediately his $37,500 advance if for any reason this purchase of Romar HiDry Marina does not close within 10 days and then the PARTNERS will have no further liability or shared interests to each other.

* * *

(Id.)  This document accordingly contemplated a future partnership between Specchio and Hix and Snedeker, with Hix and Snedeker receiving a 49% interest in RMC.

On May 22, 2006, Lynn went to Hix' office, at which time Hix and Snedeker told Plaintiff, in a heated discussion, that "there was no such closing, that the deal had fell through and that [Lynn] was not going to be paid at – what we agreed to."  (Doc. 275-1 (Dep. B.Lynn at 243-244, 248-250, 260-274, 283)).  Lynn testified that at that time, he believed that Hix and Snedeker were still acting as his attorneys – that in addition to representing him on other matters, they were representing him in the marina transaction as his lawyers as well.  (Doc. 260-9 (Dep. B.Lynn at 263-264, 277-278)).  Hix and Snedeker informed Lynn that they were unable to secure 100% financing for the Purchase Agreement.  (Doc. 260-3 (Dep. R.Hix at 226-227); Doc. 260-5 (Dep. H.Snedeker at 35)).  Lynn left

16

the office and then talked with Hix on the phone shortly thereafter, at which time Hix told Lynn that he was going to try and "make this right."  (Id. at 261).

About an hour later, Hix and Snedeker produced a memorandum of understanding to Lynn, which had been typed up by Hix in Lynn's presence, with new payment terms in order to compensate him. (Doc. 260-4 (Dep. H.Snedeker at 38-39); Doc. 272-17).  This Memorandum proposed a restructuring of Lynn's payment (to take a deferred payment of $650,000 tied into other specifics such as the success of the marina, etc.).  Lynn refused to sign and execute this Memorandum.

On May 22, 2006, RMC and Specchio executed closing documents at AmSouth Bank, including binding debt documents. (Doc. 272-13; Doc. 272-14; Doc. 247 at 12).  Specchio testified that as of May 23, 2006, he had never received an acceptable agreement signed by Lynn, Snedeker and Hix.  Therefore, "at that point, we didn't have a transaction[]" with regard to the Purchase Agreement, and so pursued his distinct back-up contract transaction.  (Doc. 275-3 (Dep. M.Specchio at 163-164)).  Specifically, Specchio testified that he went to Marr's office on that date expecting them to show up with the agreement signed by Lynn that had restructured his payment.  (Id.) Instead, they informed him that they had not reached an agreement.  (Id. at 164-165).  Specchio testified that he still intended to proceed with the transaction if Lynn had signed the new memorandum restructuring his compensation upon closing – "[t]hat was the intent."  (Id. at 165). However, that did not occur.

On May 23, 2006, Marr (as Grantor) executed his portion of the deed conveying Parcel B of the marina property to RMC (as Grantee).  (Doc. 272-7 at 2).  Marina Romar, Inc. (through Marr) executed a deed on behalf of the corporation to RMC, conveying Parcel A of the marina to RMC.

(Doc. 251-9; Doc. 251-4 (Dep. M.Specchio at 69-70)). Marina owners Bell and Marr then executed a "Seller's/Owner's Affidavit" for Commonwealth Land Title Insurance Company and its agent Gulf Coast Title Company to issue a title insurance policy. (Doc. 247 (citing Doc. 142-11)). The proceeds of the Shellbank Holdings check were disbursed to Marina Romar, Inc. (Doc. 260-10). On May 23rd, RMC (through Specchio) closed on the marina. (Doc. 247; Doc. 251-4 (Dep. M.Specchio at 69); Doc. 260-7 (Dep M.Specchio at 220-221); Doc. 272-12). Hix and Snedeker attended the closing at Marr's office. (Doc. 260-3 (Dep. R.Hix. at 168, 222, 310, 324); Doc. 275-3 (Dep. M.Specchio at 159, 202-203); Doc. 260-4 (Dep. H.Snedeker at 14, 30, 112)).

HSK did not have any involvement in the acquisition or purchase of the marina and did not hold an interest in the marina. (Doc. 260-3 (Dep. R.Hix at 277, 305, 309); Doc. 260-4 (Dep. H.Snedeker at 12-13, 246); Doc. 260-2 (Aff. Klarfeld at ¶¶6, 15, 22-23); Doc. 260-7 (Dep. M.Specchio at 188-189, 200, 205)). HSK was unaware of Hix's dealings with Lynn and the transactions at issue in this case. (Doc. 260-8 at #15; Doc. 260-2 (Aff. Klarfeld at ¶8)). No monies exchanged or deposited at the closing were paid by HSK or to HSK. (Doc. 260-7 (Dep. M.Specchio at 203; Doc. 260-2 (Aff. K.Klarfeld at ¶19)). No notes, deeds of trust, mortgages, instruments or other documents executed in connection with the May 23, 2006 closing were ever assigned to HSK. (Doc. 260-7 (Dep. M.Spechcio at 200); Doc. 260-2 (Aff. K.Klarfeld at 20)). Additionally, Lynn had no expectation that HSK would be involved with the marina transaction. (Doc. 260-9 (Dep. B.Lynn at 289)). Lynn is unable to point to any facts which would have led him to believe that HSK held Hix out as its agent. (Id. at 334, 370-373, 380-381, 389). Notably, at Lynn's deposition, his counsel stipulated that "Lynn had never heard of HSK, had no personal knowledge of HSK whatsoever, never heard the name, had never seen it in writing, had no reason to know that an LLC called . . .

HSK . . . even existed prior to the filing of this lawsuit." (Id. at 375).

On May 26th and 31st , 2006, Hix & Snedeker wrote Lynn two letters regarding closings on property at issue in the McDole litigation. (Doc. 102 at 3 and Ex. 1; Doc. 273-5).

**II.    Discussion**[8]

**A.    Standard of Review**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[9]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

---

[8]  The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. See, e.g., Gerling Global Reins. Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th Cir. 2001).  The Eleventh Circuit has held that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted).  The Court is mindful that "'[w]hen both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.'" Muzzy Products, Corp. v. Sullivan Indus., Inc., 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting Gart v. Logitech, Inc., 254 F.3d 1334, 1338-1339 (Fed. Cir. 2001)). The Court has reviewed the facts submitted by each party and has made its own examination of the evidentiary record in formulating the relevant facts and issues.

[9]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of the Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

**B.    Application**

Lynn's case against Defendants Specchio, Hix, RMC and HSK, asserting breach of contract and tort claims, arises out of a transaction to purchase a marina in Orange Beach, Alabama. On July 8, 2009, this Court granted summary judgment in favor of Defendants Specchio and Hix on Lynn's breach of contract claims. Thus, the only claims which remain are Lynn's tort claims against the defendants and Hix' counterclaims against Lynn.

However, in his response to the summary judgment motions, Lynn seeks reconsideration of this Court's prior ruling on the first motion for summary judgment with regard to the breach of contract claims. Lynn's request to reconsider the July 8, 2009 order is untimely. Accordingly, the

Court has disregarded those portions of Lynn's pleadings which endeavor to relitigate the breach of contract claim.

Moreover, Count Ten of Lynn's Second Amended Complaint (negligent loss/intentional destruction) was dismissed by this Court on April 22, 2008. (Doc. 92 at 5). Lynn's inclusion of this count in his subsequently-filed Third Amended Complaint (Doc. 93 at ¶¶168-173) does not change that prior ruling and is presumably included to preserve the issue for appeal. Accordingly, Defendants' (Specchio, RMC, Hix and HSK) respective motions for summary judgment as to this claim are **MOOT.**

Further, Hix' counterclaims against Lynn for fraud and breach of contract have been resolved because in response to Lynn's motion for summary judgment, Hix conceded these counterclaims: "[t]he bottom line of [Lynn's] arguments is correct, and summary judgment should be granted." (Doc. 268 at 1). Hix admits and concedes that he has suffered no measurable or provable damages such that the claims must fail for lack of damages. (Id.) Accordingly, Lynn's motion for summary judgment as to Defendant Hix' counterclaims for fraud and breach of contract is **GRANTED.**

### 1.    Hix' motion for summary judgment

Defendant Hix moves for summary judgment on Lynn's claims against him for the Alabama Legal Services Liability Act ("ALSLA") breach of standard of care (through circumstances of wantonness, fraud, suppression and/or a breach of fiduciary duty) (count three), fraudulent suppression (count four), breach of fiduciary duty (count five), wantonness (count seven), promissory fraud (count nine), conversion (count eleven) and civil conspiracy (count twelve). (Doc. 257).

a.    **ALSLA** **(Count 3)**

At the outset, the parties do not dispute that Hix provided legal services to Lynn and was Lynn's attorney in *certain* matters.  Indeed, Lynn was a client of Defendant Hix and his law firm Hix & Snedeker, LLC, through which the firm represented him in a variety of situations including drafting articles of organization for Lynn to become a Ben & Jerry's franchise and  representing Lynn on a traffic ticket and with regard to land litigation in Baldwin County, Alabama.  (Doc. 260-9 (Dep. B.Lynn at 76-78, 81-85, 87-88, 97-100)).  Hix has repeatedly denied, however, that an attorney-client relationship existed between Lynn and him *with regard to the "dockuminium" marina matter*.  (Doc. 274; Doc. 102 at 11 at ¶124).  Hix testified that Lynn was never provided a conflict letter stating that "we are representing you in X, but we are not representing you in Y." (Doc. 275-2 (Dep. R.Hix at 119).  However, Hix and Snedeker both testified that neither provided any legal services (individually or through the law firm) to Lynn with regard to the marina transaction.  (Doc. 275-2 (Dep. R.Hix at 320-322); Doc. 275-6 (Dep. H.Snedeker at 50, 116, 118)). According to Snedeker, their involvement "had absolutely nothing to do with the practice of law. I indicated that to Brad Lynn, that his solicitation to me and Ray Hix to be involved in the marina deal was a personal investment . . . . Again, I explained to him we're not using law firm accounts or anything, this has nothing to do with us being lawyers, this is a personal investment. And that's how the initial deposit of the funds went down."  (Doc. 275-6 (Dep. H.Snedeker at 118)).

In contrast, Lynn alleges that he was a client of the Hix & Snedeker law firm and that the firm – in particular Hix – was acting on his behalf in the "dockuminium" deal from February 27, 2006 through at least May 22, 2006 (when Lynn was presented with the Release/Contingent Compensation Document by Hix). (Doc. 276 at 4-5, 7-8, 19, 21, 31; Doc. 275-1 (Dep. B.Lynn at

22

174-176, 184-185, 192-193, 320); Doc. 260-9 (Dep. B.Lynn at 277-280)).  Lynn also asserts that

the firm was still acting as his attorney in other matters (McDole matter) through May 31, 2006.

(Doc. 276 at 23).[10]  Lynn admits that if an attorney-client relationship existed for the marina matter

then his tort claims are subsumed into the ALSLA claim.  (Doc. 278 at 33).

Even though Hix contends that he did not represent Lynn in the marina matter, he asserts that

all of the claims against him stemming from that deal are legally preempted under Section 6-5-572

*et seq.* of the Alabama Code (1975) – the Alabama Legal Services Liability Act ("ALSLA")–

because the claims arise out of his provision of legal services to Lynn.

Section 6-5-572(1) applies to:

> Any action against a legal service provider in which it is alleged that some injury or
> damage was caused in whole or in part by the legal service provider's violation of the
> standard of care applicable to a legal service provider. A legal service liability action
> embraces all claims for injuries or damages or wrongful death whether in contract
> or in tort and whether based on an intentional or unintentional act or omission. A
> legal services liability action embraces any form of action in which a litigant may
> seek legal redress for a wrong or an injury and every legal theory of recovery,
> whether common law or statutory, available to a litigant in a court in the State of
> Alabama now or in the future.

Ala. Code § 6-5-572(1) (1975).  Section 6-5-573 provides specifically that: "[t]here shall be only

*one* form and cause of action against legal service providers in courts in the State of Alabama and

it shall be known as the legal service liability action and shall have the meaning as defined herein."

Ala. Code § 6-5-573 (emphasis added).  Moreover, as noted by the Alabama Supreme Court in

Sessions v. Espy, 854 So.2d 515 (Ala. 2002), the ALSLA applies to all actions against legal service

---

[10]  Lynn also relies upon the expert report of attorney Clarence L. McDorman, Esq. in
support of his contention regarding representation – claiming that the report constitutes expert evidence
of the attorney-client relationship.  McDorman's expert analysis assumes the existence of an attorney-
client relationship as to the marina deal and then proceeds to explain why that was a breach of fiduciary
duty. (Doc. 277-1 (8/6/09 Report of Expert Clarence L. McDorman, Jr., Esq.)).

providers that allege a breach of their duties in providing legal services.  See also Bryant v. Robledo, 938 So.2d 413 (Ala. Civ. App. 2005).  Indeed, claims for an attorney's breach of fiduciary duty, violation of

 a lawyer's oath, violations of the rules of professional conduct and wantonness in violation of a lawyer's duties are subsumed in a legal malpractice action and may not be pursued as separate causes of action.  Borden v. Clement, 261 B.R. 275 (N.D. Ala. 2001).

An essential element of a claim under the ALSLA is the existence of an attorney-client relationship.  Ala. Code § 6-5-570 et seq. (1975).  See also e.g., Brackin v. Trimmier Law Firm, 897 So.2d 207, 229 (Ala. 2004); Bryant, 938 So.2d at 418.  "To create an attorney-client relationship, there must be an employment contract 'either express or implied' between an attorney and 'the party for whom he purports to act or some one authorized to represent such party[.]'"  Bryant, 938 So.2d at 418 (citations omitted).

The Court finds that there is a genuine issue of material fact whether Lynn and Hix had an attorney-client relationship with regard to the marina.  See, e.g., Sessions, 854 So.2d at 523 (finding that fact issues as to whether an attorney-client relationship existed with corporate owners precluded summary judgment as to owners' claim); Herston v. Whitesell, 348 So.2d 1054, 1057 (Ala. 1977) (finding that where alleged client, suing attorneys for negligence claimed that an attorney-client relationship existed but the attorneys denied the existence of such relationship, the existence of the relationship was a question of fact for the jury).  See also In re Employment Discrimination Litigation Against Ala., 453 F. Supp. 2d 1323, 1335-1336 (M.D. Ala. 2001) (discussing how the existence of an attorney-client relationship can depend upon the circumstances and be a question of fact – one related to the would-be client's subjective (and reasonable) belief).  As such, Defendant

Hix' motion for summary judgment as to Lynn's claim against him for ALSLA breach of standard of care is **DENIED.**

       b.       **<u>Breach of Fiduciary Duty </u>(Count 5)**

Lynn argues, in the alternative, that even if an attorney-client relationship did not exist, Hix owed him fiduciary duties based on the partnership that existed regarding the purchase of the marina. Thus, Lynn argues that his remaining tort claims of breach of fiduciary duty, fraudulent suppression, wantonness, promissory fraud, conversion and civil conspiracy are viable.

In order to establish a breach of fiduciary duty it is incumbent on Lynn to show a special relationship from which fiduciary duties arise. Assuming that Lynn is unable to establish the attorney-client relationship, Lynn relies upon the partnership (to purchase and/or flip the marina) that allegedly was formed between Hix, Snedeker and Lynn. As evidence of a partnership, Lynn points to comments made by Hix, wherein Hix stated that he considered Lynn his partner. This would normally be sufficient to create a jury question on the issue of whether a partnership was formed. However, the establishment of this fact is of no consequence because it is clear from the evidence that as of May 3, 2006, any partnership that may have existed ceased. On May 3, 2006, Lynn assigned all his interest in the marina to Hix and Snedeker. The facts relied upon by Lynn to establish a breach of fiduciary duty occurred after May 3, 2006. Thus as a matter of law, Lynn cannot establish a breach of fiduciary duty based on Hix' capacity as a partner and summary judgment is **GRANTED** on this claim (count five).

       c.       **<u>Fraudulent Suppression </u>(Count 4)**

To establish fraudulent suppression, Lynn must establish: 1) a duty on the part of Hix to disclose an existing material fact; 2) suppression of the fact by Hix; 3) Hix' actual knowledge of the

fact; 4) that Hix' suppression of the fact induced Lynn to act or refrain from acting; and 5) Lynn suffered actual damage as a proximate result of acting or of not acting.  See, e.g., Brock v. Baxter Healthcare Corp., 96 F. Supp. 2d 1352, 1359 (S.D. Ala. 2000); Ex Parte Household Retail Servs., Inc., 744 So. 2d 871, 879 (Ala. 1999); First Ala. Bank of Montgomery, N.A. v. First State Ins. Co., 899 F.2d 1045, 1056 (11th Cir. 1990).

Lynn argues that Hix fraudulently suppressed the fact that Specchio did not intend to pay Lynn's consideration ($750,000) for assigning his interest in the marina to Hix and Snedeker.  Lynn specifically points to the May 10, 2006 Use of Funds Analysis as proof that Specchio was not going to pay Lynn.  (Doc. 278 at 40).

In order to prevail on his claim of fraudulent suppression Lynn must prove that a special relationship existed such that Hix had a duty to disclose information.  Outside of the attorney-client relationship, the only special relationship alleged is that of a partnership between Lynn and Hix. As previously stated, any partnership that may have existed, terminated as of May 3, 2006, when Lynn assigned all of his rights to Hix and Snedeker.  Moreover, there is insufficient evidence to establish that, as of May 3, 2006, Hix did not intend to close on Lynn's contract to purchase the marina or that he knew that Lynn would not be paid for the assignment.  Further, even if Hix had a duty to disclose that the closing on Lynn's contract appeared to be going awry, Lynn has failed to show how any suppression of this fact after May 3, 2006, induced Lynn to act or not act.  Thus, a suppression claim is not viable and summary judgment is **GRANTED** on this claim (Count four).

### d.    Promissory Fraud (Count nine)

Lynn fails to point to any fraudulent promise made by Hix.  In fact, Lynn only argues that Specchio engaged in promissory fraud, not Hix.  Thus, because Lynn has failed to cite to sufficient

evidence from which a reasonable jury could find for him on this claim, summary judgment is **GRANTED** (Count nine).

### e.       Wantonness as to Hix and Specchio/RMC (Count seven)

"Under Alabama law, wantonness is defined as 'the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'" <u>Alfa Mut. Ins. Co. v. Roush</u>, 723 So.2d 1250, 1256 (Ala. 1998).  In proving a claim of wantonness, "it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff." <u>Id</u>. <u>Greer v Honda Mfg. of Alabama, LLC</u>, 280 Fed. Appx. 808, 813 (11th Cir. 2008) (unpublished).

Lynn has failed to even address this claim, much less point to any evidence that supports a finding that Hix and/or Specchio/RMC had the specific intent to injure him.  Accordingly, summary judgment is **GRANTED** on this claim (Count seven).

### f.       Conversion as to Hix and Specchio/RMC (Count eleven)

In the complaint, Lynn asserts that Hix is liable for conversion because he received Lynn's $12,500 into his trust account and then subsequently paid the $12,500 to the seller's trust account as earnest money.  Lynn asserts that this money was ultimately credited to RMC/Specchio at closing and thus both Hix and Specchio/RMC are liable for conversion.  Defendants argue that Lynn did not have legal title to the escrowed money because it was forfeited when the Lynn's purchase contract did not close.  Based on this argument, Defendants request summary judgment on the conversion claim.  Lynn has not addressed this issue in his response.

In Alabama, to establish conversion, "one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or

interference with another's property." See, e.g., SouthTrust Bank v. Donely, 925 So.2d 934, 939 (Ala. 2005). A plaintiff must also demonstrate that he had legal title to the property claimed to have been converted at the time of conversion. See, e.g., Roberson v. Ammons, 477 So.2d 957, 962 (Ala. 1985). Money may be subject to a conversion claim where there is an obligation to keep that money intact or to deliver it. See, e.g., Donely, 925 So.2d at 939. Generally, an action for conversion of money will not lie unless the money is specific and capable of identification. Greene County Bd. of Education v. Bailey, 586 So.2d 893, 898 (Ala.1991). "In other words, an action alleging conversion of money lies only where there is an obligation to deliver the specific pieces of the money in question or money that has been specifically sequestered, rather than a mere obligation to deliver a certain sum." Donely, 925 So.2d at 940 (citations omitted). "[W]hen funds are segregated into a separate account, such as an escrow account, those funds may be the subject of a conversion." Willingham v. United Ins. Co. of Am., 628 So.2d 328, 333 (Ala. 1993) (citations omitted).

To prevail on his conversion claim, Lynn must thus establish that he had legal title to the seller's escrowed funds at the time that Specchio/RMC closed on the marina. The record reveals that Lynn's money was escrowed in an account controlled by Hix. Hix then wrote a check to the seller which was escrowed for closing. As set forth in the Lynn Purchase Agreement, if Lynn (as purchaser) "on or before the 8th day of May, 2006, the PURCHASER has not notified SELLER in writing of PURCHASER'S intent to terminate the Agreement, the earnest money herein set forth shall become forfeitable in the event that PURCHASER fails to close[;]" and if Lynn "does not terminate this Agreement on or before the 8th day of May, 2006, but later fails to consummate this Agreement, SELLER shall have the right to pursue any remedy available. . . . including . . . . (a) retain the earnest money . . ." (Doc. 251-1 at ¶¶7, 15).

28

As already held by this Court, Lynn's Purchase Agreement did not close by the required closing date of May 22, 2006. (Doc. 247).  Pursuant to the Lynn Purchase Agreement the escrowed funds are subject to forfeiture or retention by sellers.  The defendants have argued that this right was exercised by the seller.  Lynn has not responded with any evidence to the contrary.  Accordingly, as a matter of law, Defendants Hix and Specchio/RMC's motions for summary judgment are **GRANTED** as to this claim (count eleven).

### g.      Civil conspiracy as to Hix and Specchio/RMC (Count Twelve)

Lynn contends that the defendants "engaged in [a] unified effort to suppress material facts from Lynn, namely, that they were engaged in legalistic gymnastics to deprive Lynn of $750,000 by waiting for May 22nd to become May 23rd. They waged a mutual effort to suppress from Lynn that they did not intend to close on his purchase contract, but rather a Back-Up contract, so that it would be too late for Lynn to recover and sell the property elsewhere."  (Doc. 278 at 43).  In Alabama, a civil conspiracy claim requires the plaintiff to establish that two or more individuals combined to accomplish an unlawful end or to accomplish a lawful end by unlawful means.  See, e.g., Camp v. Correctional Med. Serv., Inc., 2009 WL 3488687, *23 (M.D. Ala. Oct. 22, 2009); In re Verilink Corp., 405 B.R. 356, 380 (Bkrtcy. N.D. Ala. 2009); Swann v. Regions Bank, 17 So.3d 1180, 1194 (Ala. Civ. App. 2008).  "[L]iability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying wrong provides no cause of action, then neither does the conspiracy." Flying J Fish Farm v. Peoples Bank of Greensboro, 12 So.3d 1185, 1196 (Ala. 2008) (citations omitted).  Where the underlying tort which the parties supposedly conspired to commit is dismissed on summary judgment, the civil conspiracy action based on that tort is likewise due to be dismissed. Id.  See also e.g., Nicholson v. City of Daphne, Slip Copy, 2009 WL 1789385, *10 (S.D. Ala. Jun.

24, 2009).  Because summary judgment is granted as to the suppression claim against Hix, no action

for civil conspiracy remains viable.[11]  Accordingly, Defendants Hix and Specchio/RMC's motions

for summary judgment as to Lynn's civil conspiracy claim are **GRANTED.**

       2.      <u>Specchio/RMC's joint motion for summary judgment</u>

In addition to the moving for summary judgment on the common claims with Hix,

Defendants Specchio/RMC move for summary judgment on Lynn's claims against Specchio/RMC

for breach of fiduciary duty (count six), interference with business/contract relations (count eight),

promissory fraud (count nine).

       a.      <u>Breach of Fiduciary Duty</u> **(Count Six)**

Lynn has not alleged that he had a fiduciary relationship with either Specchio or RMC.

Instead, Lynn bases his breach of fiduciary claim on the existence of an alleged agency relationship

between Specchio, RMC and Hix.  Lynn alleges that Hix owed Lynn a fiduciary duty (due to the

existence of the alleged attorney-client relationship between Hix and Lynn for the marina

transaction) and that Hix breached that duty while acting in his capacity as an agent for

Specchio/RMC.  Lynn further alleges that because of the agency relationship, Specchio/RMC are

liable for Hix's alleged breach of fiduciary duty.  As evidence of an agency relationship, Lynn points

to the fact that Hix assisted Specchio in filing RMC's Articles of Organization, assisted Specchio

in obtaining the necessary insurance and environmental information as well as financing for the

marina transaction, and Hix attended the closing on the marina transaction with Specchio.

In Alabama, when a defendant's liability is based on the theory of agency, agency may not

---

[11] Lynn appears to allege suppression by Spechcio and RMC in the opposition to the summary judgment motions (Doc. 278).  However, Lynn did not allege a claim for suppression against Specchio or RMC in his Third Amended Complaint (Doc. 93 at 41-43)*.*

be presumed, and the plaintiff must present substantial evidence of an agency relationship to support

a finding of liability.  Lincoln Log Home Enterprises, Inc. v. Autrey, 836 So.2d 804, 806 (Ala.

2002).  Significantly, as noted by this Court in Linn v. ST Mobile Aerospace Engineering, Inc., 2008

WL 2945558, *9 (S.D. Ala. Jul. 25, 2008) (citations omitted): "[t]he Alabama Supreme Court has

opined that 'a summary judgment on the issue of agency is generally inappropriate because agency

is a question of fact to be determined by the trier of fact,' but that the party asserting it still 'has the

burden of adducing substantial evidence to prove its existence.'"

   The Court is in need of additional argument in order to determine the viability of this claim.

Oral argument on Specchio's motion for summary judgment on this issue will be heard at the pre-

trial conference set for 3:30 p.m. on December 18, 2009.   Accordingly, Specchio's motion for

summary judgment on Lynn's claim of breach of fiduciary duty is carried to trial.

### b.  Interference with business/contract relations (Count Eight)

   Lynn's interference claim against Specchio/RMC asserts that Specchio and RMC tortiously

interfered with Lynn's contractual/business relationship with Hix.  Specifically, Lynn alleges that

he had a contractual/business relationship with Hix, as a result of the First and Second Assignments,

that required Hix "to perform" on the Second Assignment contract and pay Plaintiff $375,000 on

May 22,2006 and $375,000 on May 22, 2008.[12]  Lynn further alleges that Specchio and RMC knew

---

  [12] This Court has already ruled that Hix was only required "to perform" on the Second
Assignment (*i.e.*, pay Lynn) *if* and *when* the marina Purchase Agreement closed on May
22,2006.  However, the closing did not occur by the requisite date and thus Hix had no
obligation "to perform" **on the contract** with regard to Lynn.  As noted in this Court's Order
(Doc. 247 at 8, 19):

   Accordingly, the consideration to Plaintiff for this Second Assignment of rights was
   that Defendant Hix paid him $25,000 and then agreed further to pay Plaintiff two
   installments of $375,000, with the first $375,000 payment due "if and when" the

about that relationship and intentionally interfered with same damaging him.

     To establish a claim of tortious interference with contractual/business relations in Alabama, a plaintiff must prove: 1) the existence of a contract or business relation, 2) the defendant's knowledge of the contract or business relation, 3) intentional interference with the contract or business relation, and 4) damage to the plaintiff as a result of the interference. See, e.g., MAC East, LLC v. Shoney's, 535 F.3d 1293, 1297 (11th Cir. 2008); Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc., 990 F.2d 598, 603 n. 8 (11th Cir. 1993). A key requirement is that the defendant must be a stranger to the relationship or contract with which he allegedly interfered. See, e.g., Tom's Foods, Inc. v. Carn, 896 So.2d 443, 454 (Ala. 2004). A defendant is not a stranger to a contract or business relationship when: 1) the defendant is an essential entity to the purported injured relations; 2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; 3) the defendant would benefit economically from the alleged injured relations; or 4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contract or relations. Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1156 (Ala. 2003). Notably:

------------------------------------------------------------

Purchase Agreement deal closed, and the second payment on May 22, 2008 "in the event that this transaction closes." Plaintiff contractually agreed to receive no payment in the event that the closing as described in the Purchase Agreement failed to consummate on or before May 22, 2006. Defendant Hix paid Plaintiff the $25,000 by check. [ ] (Doc. 93 at 18). Through this Second Assignment, Plaintiff was giving up all of his contractual rights to Defendant Hix. (Doc. 146-4 at 58 (Dep. Plf at 225-226, 228)).

                        * * *

. . . . through the Second Assignment, Defendant Hix contractually agreed to pay Plaintiff $375,000 (plus) only if the marina Purchase Agreement transaction closed no later than May 22, 2006. There was no obligation for Defendant Hix to perform under the Second Assignment because the conditions precedent to his obligation had not occurred. Thus, as a matter of law Defendant Hix did not breach the contract.

. . . . One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract. In such an instance, the participant is not a stranger to the business relationship and the interwoven contractual arrangements define the participant's rights and duties with respect to the other individuals or entities in the relationship. If a participant has a legitimate economic interest in and a legitimate relationship to the contract, then the participant enjoys a privilege of becoming involved without being accused of interfering with the contract. We conclude that . . . . [the] argument-that one can be considered a stranger to the relationship if one does not effectively control performance under the contract-is too narrow. . . .

Id. at 1157.  In sum, a defendant is a party in interest to a business or contractual relationship for purposes of a tortious interference claim if the defendant has any beneficial or economic interest in, or control over, that relationship.  See, e.g., Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC, 613 F. Supp. 2d 1271, 1282 (S.D. Ala. 2009); Peacock v. Merrill, 2005 WL 2739138 (S.D. Ala. Oct. 24, 2005).

None of the parties have addressed the "stranger" requirement for Lynn's interference claim to prevail.  The stranger requirement for such claim, however, is dispositive here.  Specifically, the record is undisputed that there was a contractual/business relationship between Lynn, Hix and Snedeker stemming from the Purchase Agreement, and that Specchio had knowledge of same.  The record establishes further, that Specchio was *not* a stranger to that relationship.  In contrast, Specchio (notably his financing) was essential to the ability to close on the Purchase Agreement because neither Lynn nor Hix could provide the four million dollar purchase price.  Thus, Specchio was an essential entity to the marina transaction that Lynn hoped would close on May 22, 2006.  The parties were involved in a comprehensive interwoven set of contract or business relations.  Accordingly, Defendant Specchio/RMC's motion for summary judgment as to Lynn's interference with contractual/business relations claim is **GRANTED.**

33

c.        **Promissory Fraud** (Count Nine)

Lynn's promissory fraud claim against Specchio is premised on the allegation that Specchio fraudulently promised, through the April 26, 2006 Memorandum of Understanding, to pay Lynn $750,000 for the assignment of Lynn's rights in the marina to Hix and Snedeker.  (Doc. 278 at 40-42).  In Alabama, "a claim of promissory fraud is one based upon a promise to act or not to act in the future."  Ex parte Michelin North America, Inc., 795 So.2d 674, 678 (Ala. 2001).  The elements of fraud are: 1) a false representation; 2) of a material existing fact; 3) reasonably relied upon by the plaintiff; 4) who suffered damage as a proximate consequence of the misrepresentation.  Southland Bank v. A&A Drywall Supply Co., Inc., 2008 WL 5195187, *11 (Ala. Dec. 12, 2008) (unpublished).  To prevail on a promissory fraud claim, two additional elements must be satisfied: proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised; and proof that the defendant had an intent to deceive.  Michelin North America, 795 So.2d at 678-679.  Essential to any fraud claim is that plaintiff "must have reasonably relied on the alleged misrepresentation."  Hunt Petroleum Corp. v. State, 901 So.2d 1, 4 (Ala. 2004).

The April 26, 2006 Memorandum provided for a proposed partnership entity comprised of Specchio, Hix and Snededker, that would be created to purchase, lease and/or sell the marina property.  However, formation of this partnership was a future event – one which was wholly contingent upon the closing of Lynn's Purchase Agreement no later than May 22, 2006, an event which did not occur.  As such, the partnership pursuant to the Memorandum never materialized and thus Specchio had no duty to pay the additional consideration to Lynn.

Even if Specchio was bound under the memorandum to pay Lynn, Lynn's claim of promissory fraud fails for a more basic reason; Specchio never made a promise to Lynn which Lynn

relied upon.  Lynn testified that he was wholly unaware of the existence of the Memorandum and moreover, knew nothing about the specifics of any arrangements between Hix, Snedeker and Specchio before the lawsuit commenced.  (Doc. 251-5 (Dep. B.Lynn at 349-351)).  According to Lynn, he had never talked to Specchio over the telephone, never received any written communication from Specchio, and never saw any documents signed by Specchio.  (Id. at 338).  Notably, Lynn did not know what promises Specchio may have made to Hix about his involvement or what financial obligations Specchio was willing to make.  (Id. at 350-351).

Crucial to a claim of promissory fraud is that the plaintiff "reasonably relied" on a representation.  See, e.g., Hunt Petroleum, 901 So.2d at 4.  Even assuming arguendo that the remaining elements of promissory fraud are present, Lynn's claim fails because he cannot establish that he reasonably relied upon any representations by Specchio contained in the Memorandum for the simple reason that he did not even know that it existed and/or that any such representation had been made (Doc. 251-5 (Dep. B.Lynn at 349-351)).  Because Lynn was unaware of any of the representations made by Specchio, he could not have been induced to act upon any such representations or reasonably relied upon same.  Underscoring this conclusion is the fact that Lynn has not even addressed the reliance issue in response to the summary judgment motion, much less provided substantial evidence to the Court to support a contrary finding.  Accordingly, as a matter of law, Specchio/RMCs motion for summary judgment as to Lynn's promissory fraud claim against Specchio is **GRANTED.**

### 3.      HSK's motion for summary judgment

Defendant HSK moves for summary judgment on Lynn's claims against it for fraudulent suppression (count four), breach of fiduciary duty (count five), wantonness (count seven),

conversion (count eleven) and civil conspiracy (count twelve).  Lynn hinges _all_ of these claims against HSK on the theory of agency; namely, that Hix acted as HSK's agent in connection with the marina transaction such that provisions of the Alabama Limited Liability Company Act (§10-12-21[13] and §10-12-22[14]) and Alabama common law agency principles render HSK liable.  However, Lynn has failed to provide sufficient evidence to rebut HSK's evidence that it had no involvement in the marina transaction.

At the outset, when considering the agency statutes HSK's Operating Agreement clearly restricts the rights and duties of Hix as a member of the LLC.  HSK's Operating Agreement provides for specific management and control of HSK and its business operations – namely, that the management and control rested exclusively with its manager Klarfeld and not the LLCs members.  (Doc. 260-65).  HSK's Operating Agreement provided that members who are not managers (_i.e._, Hix) "shall not participate in the day-to-day control of the business affairs of the LLC, transact any business on behalf of the LLC, or have any power or authority to bind or obligate the LLC."  (Id.)  HSK members can only receive power and authority to act on behalf of the LLC under specific circumstances (specific grant, approval proposal or written consent/resolution).  (Id.)

---

[13] Section 10-12-21(a-b) provides that: (a) Except as provided in subsection (b), every member is an agent of the limited liability company for the purpose of its business or affairs. . . . .[;] (b) If the articles of organization provide that management of the limited liability company is vested in a manager or managers, both of the following conditions apply: (1) No member, acting solely in the capacity as member, is an agent for the limited liability company . . . .

[14] Section 10-12-22(a-b) provides that: (a) Unless otherwise stated in the articles of organization, the management of the limited liability company is vested in its members. Subject to any provisions in the operating agreement or this chapter restricting or enlarging the management rights and duties of any person or group or class of persons, the members shall have the right and authority to manage the business or affairs of the limited liability company and to make all decisions with respect thereto[;] (b) If the articles of organization vests management of the limited liability company in one or more managers, then the managers shall have the power to manage the business or affairs of the limited liability company as provided in the operating agreement . . . .

Hix testified that he had no power or authority to bind or obligate HSK and he could not act on behalf of or bind HSK unless the members authorized that act and he had no such authorization to act on behalf of HSK for the marina transaction.  (Doc. 260-3 (Dep. R.Hix at 304-305)).  In sum, as a non-manager, Hix was generally prohibited from transacting any business on behalf of HSK and had no power or authority to bind or obligate HSK.  Lynn has failed to rebut this evidence.

With regard to the common law agency theory (Lynn's alternative), there is insufficient evidence that Hix acted as HSK's agent in the marina matter, much less that HSK was even involved in that matter.  Liability based upon an agency theory cannot be presumed, rather a principal is liable for the acts of its agent only if the agent acted with express actual authority, implied actual authority, apparent authority or ratified authority.  See, e.g., Brannan & Guy, P.C. v. City of Montgomery, 828 So.2d 914, 924 (Ala. 2002).  As detailed supra, the record reveals as follows:

- HSK did not have any involvement in the acquisition or purchase of the marina and did not hold an interest in the marina and moreover, was not part of any assignments or contracts related to same (Doc. 260-3 (Dep. R.Hix at 278, 283); Doc. 260-2 (Aff. Klarfeld at ¶¶6-813, 17-18, 22); Doc. 260-7 (Dep. M.Specchio at 200));
- No monies exchanged or deposited at the closing were paid by HSK or to HSK (including the $12,500 earnest money of Lynn) (Doc. 260-7 (Dep. M.Specchio at 200-201, 203); Doc. 260-3 (Dep. R.Hix at 305); Doc. 260-2 (Aff. Klarfeld at ¶¶19, 23));
- No notes, deeds of trust, mortgages, instruments or other documents executed in connection with the May 23, 2006 closing were assigned to HSK (Doc. 260-7 (Dep. M.Specchio at 200-201); Doc. 260-2 (Aff. Klarfeld at ¶20));
- HSK never represented to Lynn that Hix had permission to transact any business with him on behalf of HSK (Doc. 260-2 (Aff. Klarfeld at ¶26));
- Lynn testified that he did not know who HSK was and had never heard of HSK (Doc. 260-9 (Dep. B.Lynn at 234-235));
- Lynn testified that he had no expectation that HSK would be involved with the marina transaction and that no one told him that Hix or Snedeker were acting on behalf of HSK (Doc. 260-9 (Dep. B.Lynn at 235, 289, 380-381); 260-3 (Dep. R.Hix at 306); Doc. 251-7 (Dep. R.Hix at 283)); and
- Lynn testified that he did not know if he ever had any kind of relationship with HSK, did not believe that Hix was authorized to make decisions for

HSK or manage its business or affairs, and did not know of any facts which would have led him to believe that HSK held Hix out as its agent (Doc. 260-9 at 289, 334, 372-373, 383, 389)).

Additionally, HSK was completely unaware of Hix' dealings with Lynn and knew nothing about the marina transaction. (Doc. 260-3 (Dep. R.Hix at 48, 277, 305); Doc. 260-4 (Dep. H.Snedeker at 12-13, 246); Doc. 260-7 (Dep. M.Specchio at 200); Doc. 260-2 (Aff. Klarfeld at ¶¶8, 14)). According to Snedeker, HSK was completely uninvolved in the marina transaction. (Doc. 260-4 (Dep. H.Snedeker at 12-13)). HSK Manager Klarfeld testified as well, that Hix and Snedeker do not conduct all the day-to day activities for HSK in Alabama. (Doc. 260-6 (Dep. K.Klarfeld at 45)). Specchio also testified that he has never transacted business of any kind in his individual capacity or on behalf of RMC, with HSK. (Doc. 260-7 (Dep. M.Specchio at 188)). Moreover, Lynn believed that he was transacting business with Hix and Snedeker, not HSK. (Doc. 260-9 (Dep. B.Lynn at 289, 364-365, 370-373, 380-383, 389)).

Thus, to the extent Lynn bases his agency theory in Hix' activities for HSK (Doc. 278 at 30-31, 39-40), the record reveals that, *at best*, those activities were for other distinct matters wholly unrelated to the marina transaction (concerned with managing properties that HSK already owned in Alabama. (Doc. 260-3 (Dep. R.Hix at 44-45)). Indeed, Lynn has not demonstrated an evidentiary link between HSK and the marina transaction to then establish that Hix was acting as HSK's agent for same, much less that HSK was even involved.

Further, Lynn's reference to certain e-mails which show an e-mail signature block listing HSK along with Hix and his law firm does not, in and of itself, support his claim. Evidence of company logos is not sufficient, standing alone, to create apparent authority. See, e.g., Malmberg v. American Honda Motor Co., Inc., 644 So.2d 888, 890 (Ala. 1994). Moreover, Hix testified that

any e-mails regarding the marina property which show HSK in the signature block was just his "default email signature" during that period of time, and that the e-mails were written in his individual capacity.  (Doc. 260-3 (Dep. R.Hix at 42-43, 306)).  Snedeker testified that he never understood those e-mails to mean that Hix was communicating with him in his capacity as a member of HSK.  (Doc. 260-4 (Dep. H.Snedeker at 251-252)).  Likewise, Specchio testified that he never understood those e-mails from Hix to have been sent to him on behalf of HSK.  (Doc. 260-7 (Dep. M.Specchio at 204)).

Finally, Lynn's reference to the engineering firm's mistake in naming HSK as the client on the cover page of an environmental assessment that Hix asked them to prepare (Doc. 260-13 (Aff. Cunningham and Ex. 3 thereto)), has been explained through non-contradicted evidence to be just that  –  a mistake.  (Doc. 260-43(Dep. R.Hix at 285, 287-292); Doc. 260-12 (Aff. Cunningham at ¶¶4-5, 7-9); Doc. 260-20 (Aff. Taylor at ¶¶4, 6-9)).  This mistake was corrected and the assessment was amended to reflect the correct client, RMC.  (Doc. 260-12 (Aff. Cunningham at ¶10 and Ex. 4 thereto); Doc. 260-3 (Dep. R.Hix at 298-299); Doc. 260-20 (Aff. Taylor at ¶10)).  Hix also testified that when he ordered the environmental assessment, he did so individually – not for HSK– and did not mention HSK or order any report on behalf of HSK.  (Doc. 260-3 (Dep. R.Hix at 283-285, 302)).  Likewise, Specchio testified that either he or RMC were the client of Taylor Engineering, for purposes of the report.  (Doc. 260-7 (Dep. M.Specchio at 193-194)).

In sum, given the abundance of evidence indicating HSK's non-involvement in the marina transaction, a reasonable jury could not find Lynn's agency argument persuasive.  Where a movant in a motion for summary judgment shows that no agency relationship exists – *which HSK has accomplished here* – then the non-movant asserting agency has the burden of presenting substantial

evidence of the alleged agency.  See, e.g., Thrash v. Credit Acceptance Corp., 821 So.2d 968, 972 (Ala. 2001).  Lynn has failed to do so.  Accordingly, as a matter of law, Defendant HSK's motion for summary judgment as to Lynn's claims against it for fraudulent suppression, breach of fiduciary duty, wantonness, conversion and civil conspiracy, is **GRANTED.**

## III.   <u>Conclusion</u>[15]

Based upon the foregoing, the Court finds and it is hereby **ORDERED** that:

- Lynn's motion for summary judgment as to Defendant Hix' counterclaims is **GRANTED;**

- Defendant Hix' motion for summary judgment as to Lynn's negligent loss/intentional destruction claim (count ten) is **MOOT;**

- Defendant Hix' motion for summary judgment as to Lynn's claims for ALSLA breach of standard of care (count three) is **DENIED;**

- Defendant Hix' motion for summary judgment as Lynn's claim of fraudulent suppression (count four), breach of fiduciary duty (count five), wantonness (count 7), promissory fraud (count nine), conversion (count eleven) and civil conspiracy (count twelve) is **GRANTED**;

- Defendant Specchio/RMC's motion for summary judgment as to Lynn's negligent loss/intentional destruction claim is **MOOT;**

- Defendant Specchio/RMC's motion for summary judgment as to Lynn's claims for interference with contractual/business relations (count eight), promissory fraud (count nine), wantonness (count seven), conversion (count eleven) and civil conspiracy (count twelve) is **GRANTED**;

- Defendant Specchio/RMC's motion for summary judgment as to Lynn's claim of breach of fiduciary duty is **carried to trial**;

- Defendant HSK's motion for summary judgment as to Lynn's claim for

---

[15] Lynn has asserted in his response to summary judgment that he is claiming loss opportunity tort damages.  Defendants respond that the Court should not allow this damage claim because Lynn has not previously disclosed this category of tort damages.  **<u>Lynn is ordered to respond to this argument on or before December 11, 2009</u>**.

negligent loss/intentional destruction is **MOOT;** and

•       Defendant HSK's motion for summary judgment as to Lynn's claims against it for fraudulent suppression (count four), breach of fiduciary duty(count five), wantonness (count seven), conversion (count eleven) and civil conspiracy (count twelve) is **GRANTED.**

**DONE** and **ORDERED** this the **1st** day of **December 2009.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

41